

# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

Case Type:  Other Civil

Court File No.: _____

U.S. District Court Judge: _____

Daniel Larsen, Joseph Goodwin, Guy Greene, Terry L. Branson, August Kingbird, Mark Wallace, Austin Black Elk, Michael Perseke, Chester Grauberger, Darrin Dotson, Dezeray Roblero-Barrios, Ernesto Longoria, Joseph Delle, Danny Stone, Matthew Wong, Leslie Tallman, Robert Suddeth, Allen Pyron, Anthony Garnett, Donald Hill, Paul Knutson, Joshua Brundy, Julian Caprice, David McGuire, Robert Smith, Shawn Fletcher, David Hamilton, Jacquard Larkin, Raymond Semler, Shawn Jamison, Roland Brant, Aaron Hayes, Anthony Green, Kevin Nelson, Richard Fageroos, Max Ortega, Dan Wilson, Michael Rogers, Jose Gutierrez, Sean Brinkman, Thomas Bolter, Jeremy Bilder, Brent Nielsen, Christopher Sime, Kevin Karsjen, Cornell Williamson, Jeremy Asher and all others similarly situated;

PLAINTIFFS (Pro-Se),

vs.

State of Minnesota; Minnesota Department of Human Services; Minnesota Sex Offender Program; Minnesota Attorney General's Office; Minnesota Department of Corrections; Minnesota County's Health and Human Services – (i.e. Anoka County Health and Human Services Director, Ramsey County Health and Human Services Director, Sherburne County Health and Human Services Director, St. Louis County Health and Human Services Director, Goodhue County Health and Human Services Director, Dakota County Health and Human Services Director, Washington County Health and Human Services

21-cv-568 PJS/HB

**42 U.S.C. § 1983 - CIVIL RIGHTS COMPLAINT FOR VIOLATIONS OF**

**Title 42 U.S.C. § 1985(3)**

**Title 42 U.S.C. § 1986**

**ADA, Title 42 U.S.C. § 12131, et seq.**



1

Director et.al)Tim Walz, Governor – State of
Minnesota; Jodi Harpstead, Commissioner –
Minnesota Department of Human Services; Nancy
Johnston, Executive Director Minnesota Sex
Offender Program – Minnesota Department of
Human Services; Marshall Smith, Department of
Health Systems Chief Executive Officer – Direct
Care and Treatment – Minnesota Department of
Human Services; Keith Ellison, Attorney General –
State of Minnesota; Dr. Elizabeth Peterson,
Associate Clinical Director – Psychological
Services Director, Minnesota Sex Offender
Program; Dr. Crystal Leal, Psychological Services
Unit 1-C, Minnesota Sex Offender Program; Peter
Puffer, Clinical Director – Chief Executive Officer
III – Minnesota Department of Human Services,
Minnesota Sex Offender Program; Kevin Moser,
Operations Director – Chief Executive Officer III –
Minnesota Department of Human Services,
Minnesota Sex Offender Program; Paul Schnell,
Commissioner - Minnesota Department of
Corrections; an unknown number of John Does and
Jane Does sued in their individual
and official capacities;

DEFENDANTS.

**The Remainder Of This Page Intentionally Left Blank**

# I.  INTRODUCTION

1.      This case arises in the midst of a constitutional crisis in Minnesota.  Where Minnesota court(s), and officials, have not come to terms with their constitutional duty to release class members from their unlawful preventive detention at the MSOP Program and continue to impose unnecessary restraints upon their liberties.

2.      For at least 80 civilly committed persons in Minnesota, a certain death, not treatment, has been their fate while detained at the MSOP program.

3.      This action gives a glimpse into a story of just how deep seated and corrupt State officials have become when there are no checks or balances in their law making duties. It tells a story of how political fervor rules and that the constitution becomes the exception to the rule.

4.      The mere fact that State officials can arbitrarily label and stigmatize class members with false and misleading information to the public to push the *status quo* of preventive detention, makes this an outrageous case of government misconduct.

5.      The civil commitment of plaintiffs has become a public corruption scandal that has harmed Minnesotan taxpayers who have wasted millions of health care dollars for so-called treatment over the past 30 years, when officials knew that the treatment being offered at MSOP is nothing more than a "sham". There are less costly and restrictive means readily available for class members safe return into the community.

6.      Now there is evidence that Defendants have established a system of detaining the typical criminal recidivist rather than what civil commitment was clearly established for and constitutionally intended for.

7.      For that reason Plaintiffs intend to provide this court with enough evidence to declare by "*the clearest proof*" that the Sexually Dangerous Persons statute has negated its civil intent by no longer serving its legitimate government interest. Becoming unconstitutional therefore violating both the Double Jeopardy and Ex Post Facto Clauses of the Minnesota and United States Constitutions.

8.      Shockingly, dangerous offenders who are incarcerated within Minnesota's prisons are vastly greater in numbers and are more dangerous therein representing a much greater risk to social safety. Yet prisoners that rob and kill are freed after serving only 2/3rds of their sentence without facing the potential of being civilly committed.

9.      The evidence in this case will demonstrate not only do defendants acknowledge but also outside experts openly concede that there is hundreds of class members at the MSOP that are not "dangerous" or "mentally ill" requiring psychiatric mental health treatment at MSOP. Plaintiffs have a liberty interest in not being label dangerous and mentally ill in this case.

10.     Plaintiffs have been arbitrarily labeled and repeatedly stigmatized erroneously by Minnesotan legislatures, the media, and state officials providing false positives declaring that plaintiffs might commit another sex crime in the future.

11.     Plaintiffs are trapped in one of the most outrageous public corruption scandals in the Minnesotan state history.  Petitioners are provided with no hope of ever getting out from under their civil commitment because of something they might do in the future. The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special political interests.

12.     Plaintiffs, individually and as a class are subjected by defendants to services not relevant to what they are commitment for as a Sexually Dangerous Person, under Minn. Stat. §246B.01-02.

13.     Plaintiffs seek to sue defendants, each a public official or entity responsible for implementation and enforcement of Minn. Stat. §246B.01-02 - for violation of plaintiffs' constitutional and federal statutory rights.  By this action, plaintiffs, individually or as a class, do not seek review of their individual state commitment orders of judgments.  Nor do plaintiffs, individually or as a class, seek to enforce the specific state law provisions of Minn. Stat. §246B.01-02.  Instead, each plaintiff seeks prospective relief only under federal law for violations of his federal rights.

## II. JURISDICTION AND VENUE

14.     Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343. Supplemental jurisdiction is conferred on this Court by 28 U.S.C. § 1367 in that plaintiffs' sole state law claim relates to their federal law claims, forming part of the same case controversy under Article III of the United States Constitution.

5

15.     Venue is proper in that the claims alleged herein arose in Moose Lake,

Minnesota.

## III.     PARTIES

**A. NAMED PLAINTIFFS:**

16.     Plaintiffs Daniel Larsen, Joseph Goodwin, Guy Greene, Terry L. Branson,

August Kingbird, Mark Wallace, Austin Black Elk, Michael Perseke, Chester

Grauberger, Darrin Dotson, Dezeray Roblero-Barrios, Ernesto Longoria, Joseph

Delle, Danny Stone, Matthew Wong, Leslie Tallman, Robert Suddeth, Allen Pyron,

Anthony Garnett, Donald Hill, Paul Knutson, Joshua Brundy, Julian Caprice, David

McGuire, Robert Smith, Shawn Fletcher, David Hamilton, Jacquard Larkin,

Raymond Semler, Shawn Jamison, Roland Brant, Aaron Hayes, Anthony Green,

Kevin Nelson, Richard Fageroos, Max Ortega, Dan Wilson, Michael Rogers, Jose

Gutierrez, Sean Brinkman, Thomas Bolter, Jeremy Bilder, Brent Nielsen,

Christopher Sime, Kevin Karsjen, Cormell Williamson, Jeremy Asher and all others

similarly situated; are each unlawfully confined by defendants at the Minnesota Sex

Offender Program (hereinafter "MSOP").

17.     That the "intent" of Defendants services results in unnecessary suffering and

clearly violates plaintiffs' federal constitutional and statutory rights.  Plaintiffs seek

prospective relief if this court finds enough evidence that the SOP[1] Act has negated

its legitimate government interest and is punitive in violation of the Double

---

[1] Sex Offender Program (hereinafter "SOP")

Jeopardy and Ex Post Facto Clauses, Procedural and Substantive Due Process of the United States Constitutions. They also seek certification of a class of similarly situated persons under Rule 23 of the Federal Rules of Civil Procedure.

18.     Plaintiffs seek a declaration that Minn. Stat. §246B.01-02 is unconstitutional *on its face* because it does not require that any one defendants initiate court proceedings for release of individuals who no longer meet SDP criteria or services at the SOP. Moreover, class members contend that evidence during the *Karsjens* court demonstrate that the defendants are not properly trained in observing, diagnosing and rehabilitating the class members for discharge.

## B. NAMED DEFENDANTS:

19.     State of Minnesota; Minnesota Department of Human Services; Minnesota Sex Offender Program; Minnesota Attorney General's Office; Minnesota Department of Corrections; Minnesota County's Health and Human Services – (i.e. Anoka County Health and Human Services Director, Ramsey County Health and Human Services Director, Sherburne County Health and Human Services Director, St. Louis County Health and Human Services Director, Goodhue County Health and Human Services Director, Dakota County Health and Human Services Director, Washington County Health and Human Services Director et.al)Tim Walz, Governor – State of Minnesota; Jodi Harpstead, Commissioner – Minnesota Department of Human Services; Nancy Johnston, Executive Director Minnesota Sex Offender Program – Minnesota Department of Human Services; Marshall Smith, Department

of Health Systems Chief Executive Officer – Direct Care and Treatment –
Minnesota Department of Human Services; Keith Ellison, Attorney General – State
of Minnesota; Dr. Elizabeth Peterson, Associate Clinical Director – Psychological
Services Director, Minnesota Sex Offender Program; Dr. Crystal Leal,
Psychological Services Unit 1-C, Minnesota Sex Offender Program; Peter Puffer,
Clinical Director – Chief Executive Officer III – Minnesota Department of Human
Services, Minnesota Sex Offender Program; Kevin Moser, Operations Director –
Chief Executive Officer III – Minnesota Department of Human Services, Minnesota
Sex Offender Program; Paul Schnell, Commissioner - Minnesota Department of
Corrections; an unknown number of John Does and Jane Does

20.     Defendant **Tim Walz** is the Governor for the State of Minnesota.  As
Governor, Mr. Walz is responsible for the care, custody, and control of Sexually
Dangerous Persons pursuant to Minn. Stat. §246B.01-02, including the
promulgation and enforcement of certain policies, practices and procedures
challenged in the action.  Mr. Walz is a "person" within the meaning of 42 U.S.C.
§§ 1983, 1985 and 1986; he is being sued in his individual and official capacities.
Governor Walz, acting in his official capacity, is also a "government" within the
meaning of Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §
12131(1)(A) and Rehabilitation Act, 29 USCS 701 et seq.

21.     Defendant **Minnesota Attorney General Keith Ellison**.  As Attorney
General, Mr. Ellison is responsible for the care, custody, and control of Sexually
Dangerous Persons pursuant to Minn. Stat. §246B.01-02, including the

8

promulgation and enforcement of certain policies, practices and procedures challenged in the action. Mr. Ellison is a "person" within the meaning of 42 U.S.C. §§ 1983, 1985 and 1986; he is in charge of the forensic training of his employee's in civil commitment hearings and producing exculpatory evidence regarding class members right to liberty from civil commitment, he is sued in his individual and official capacities. Attorney General Ellison, acting in his official capacity, is also a "government" within the meaning of Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131(1)(A) and Rehabilitation Act, 29 USCS 701 et seq.

22.     Defendant **Minnesota State Attorney General's Office**, is a "public entity" within the meaning of Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131(1)(A) and Rehabilitation Act, 29 USCS 701 et seq.

23.     Defendant **Jodi Harpstead** is the Director of the Minnesota Department of Human Services. As director, Mrs. Harpstead is responsible for the care, custody, and control of Sexually Dangerous Persons pursuant to Minn. Stat. §246B.01-02, The Executive Director of the Minnesota Sex Offender Program is charged with overall responsibility for the operation of the program. Minn. Stat. Ann. 246B.01. Furthermore, the director is charged with establishing a grievance policy and related procedures that address and attempt to resolve civilly committed sex offender concerns and complaints, which "must include procedures for assessing or investigating a civilly committed sex offender's concerns or complaints. Minn. Stat. 246B.03, subd. 3(a), including the promulgation and enforcement of certain policies, practices and procedures challenged in the action. Mrs. Harpstead is a

"person" within the meaning of Title II of the Americans with Disabilities Act

(ADA), 42 U.S.C. § 12131(1)(A) and Rehabilitation Act, 29 USCS 701 et seq.42

U.S.C. §§ 1983, 1985 and 1986; she is sued in her individual and official capacities.

24.     Defendant **Marshall Smith**, Department of Health Systems Chief Executive

Officer – Direct Care and Treatment – Minnesota Department of Human Services

Commissioner.  As Chief Executive Officer, Mr. Smith is responsible for the care,

custody, and control of Sexually Dangerous Persons pursuant to Minn. Stat.

§246B.01-02, including the promulgation and enforcement of certain policies,

practices and procedures challenged in the action.  Mr. Smith is a "person" within

the meaning of 42 U.S.C. §§ 1983, 1985 and 1986; he is sued in his individual and

official capacities.  Commissioner Smith, acting in his official capacity, is also a

"government" within the meaning of Title II of the Americans with Disabilities Act

(ADA), 42 U.S.C. § 12131(1)(A) and Rehabilitation Act, 29 USCS 701 et seq..

25.     Defendant **Nancy Johnston** is the Executive Director of the Minnesota

Department of Human Services.  As executive director, Ms. Johnston is responsible

for the care, custody, and control while monitoring that assessments and services of

Sexually Dangerous Persons pursuant to Minn. Stat. §246B.01-02, including the

promulgation and enforcement of certain policies, practices and procedures

challenged in the action.  Ms. Johnston is a "person" within the meaning of 42

U.S.C. §§ 1983, 1985 and 1986; she is sued in her individual and official capacities.

MSOP Executive Director Johnston, acting in her official capacity, is also a

"government" within the meaning of Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131(1)(A) and Rehabilitation Act, 29 USCS 701 et seq.).

26.     Defendant **Peter Puffer** is the Chief Executive Officer III – Clinical - of the Minnesota Department of Human Services.  As Chief Executive Officer III, Mr. Puffer is responsible for the care, custody, and control of Sexually Dangerous Persons pursuant to Minn. Stat. §246B.01-02, including the promulgation and enforcement of certain policies, practices and procedures challenged in the action. Mr. Puffer is a "person" within the meaning of 42 U.S.C. §§ 1983, 1985 and 1986; he is sued in his individual and official capacities.  Chief Executive Officer III Puffer, acting in his official capacity, is also a "government" within the meaning of Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131(1)(A) and Rehabilitation Act, 29 USCS 701 et seq.

27.     Defendant **Kevin Moser** is the Chief Executive Officer III – Operations - of the Minnesota Department of Human Services.  As Chief Executive Officer III, Mr. Moser is responsible for the care, custody, and control of Sexually Dangerous Persons pursuant to Minn. Stat. §246B.01-02, including the promulgation and enforcement of certain policies, practices and procedures challenged in the action. Mr. Moser is a "person" within the meaning of 42 U.S.C. §§ 1983, 1985 and 1986; he is sued in his individual and official capacities.  Chief Executive Officer III Moser, acting in his official capacity, is also a "government" is a "public entity" within the meaning of Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131(1)(A) and Rehabilitation Act, 29 USCS 701 et seq..

28.     Defendant **Dr. Elizabeth Peterson** is the Associate Clinical Director –

Psychological Services Director - of the Minnesota Sex Offender Program Moose

Lake, Minnesota.  As the Psychologist, Dr. Peterson is responsible for the

assessments and other services of Sexually Dangerous Persons committed to the

Minnesota Sex Offender Program, including the promulgation and enforcement of

certain policies, practices and procedures challenged in this action.  Mrs. Peterson is

also a "person" within the meaning of 42 U.S.C. §§ 1983, 1985 and 1986; she is

sued in her individual and official capacities.  Dr. Peterson, acting in her official

capacity, is also a "government" within the meaning of Title II of the Americans

with Disabilities Act (ADA), 42 U.S.C. § 12131(1)(A) and Rehabilitation Act, 29

USCS 701 et seq..

29.     Defendant **Dr. Crystal Leal** is the Psychologist for unit 1-C –at the Minnesota

Sex Offender Program Moose Lake, Minnesota.  As the Psychologist, Dr. Leal is

responsible for the assessments and other services of Sexually Dangerous Persons

committed to the Minnesota Sex Offender Program, including the promulgation and

enforcement of certain policies, practices and procedures challenged in this action.

Mrs. Leal is also a "person" within the meaning of 42 U.S.C. §§ 1983, 1985 and

1986; she is sued in her individual and official capacities.  Dr. Leal, acting in her

official capacity, is also a "government" is a "public entity" within the meaning of

Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131(1)(A) and

Rehabilitation Act, 29 USCS 701 et seq.

30.     Defendant **Paul Schnell** is the Commissioner for the Minnesota Department of

Corrections.  As commissioner, Mr. Schnell is responsible for the assessment and

identification of inmates and juveniles imprisoned by the state and referral to state's

attorneys for civil commitment proceedings under Minn. Stat. §246B.01-02,

including the promulgation and enforcement of certain policies, practices and

procedures challenged in this action.  Mr. Schnell is also a "person" within the

meaning of 42 U.S.C. §§ 1983, 1985 and 1986; he is sued in his individual and

official capacities.  Commissioner Schnell, acting in his official capacity, is also a

"government" within the meaning of Title II of the Americans with Disabilities Act

(ADA), 42 U.S.C. § 12131(1)(A) and Rehabilitation Act, 29 USCS 701 et seq..

31.     Defendant **State of Minnesota** is a "public entity" within the meaning of Title

II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131(1)(A) and

Rehabilitation Act, 29 USCS 701 et seq.

32.     Defendant County Level Health and Human Services employees ("HHS")

**Minnesota County's** (i.e. Anoka, Ramsey, St. Louis, Goodhue, Dakota, et.al) is

each a "public entity" within the meaning of Title II of the Americans with

Disabilities Act (ADA), 42 U.S.C. § 12131(1)(A) and Rehabilitation Act, 29 USCS

701 et seq., Mr./Mrs./Ms./Mdme./Dr. **John Doe and/or Jane Doe** are employed by

the County Social Services as a Supervisor. He/she has held that position since

approximately October 2005. As Social Services Supervisor for a County within the

state of Minnesota, **John Doe and/or Jane Doe** has supervisory authority and

responsibility for the administration and operations of Human Services; for

13

monitoring services provided by Defendants that are excessive or may harm Plaintiffs; for training all Social Services personnel and for the custody and treatment of Class Members. **John Doe and/or Jane Doe** knew or should have known about and approved or indeed promulgated or directed, the various policies, practices and procedures concerning the manner and special relationship to Plaintiffs and that created the punitive environment and excessively restrictive services under which Plaintiffs are presently confined. In many instances, **John Doe and/or Jane Doe** directly participated in and exercised reasonably close supervision of the personnel who are responsible for the deprivation of Class Member's constitutional rights, as alleged more specifically below.

33.     Defendant **Minnesota Department of Human Services** (DHS) is a "public entity" is a "public entity" within the meaning of Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131(1)(A) and Rehabilitation Act, 29 USCS 701 et seq.. It is also a "program or activity that receives federal financial assistance" within the meaning of 42 U.S.C. §§ 2000cc-1 and 2000cc-5.

34.     Defendant **Minnesota Department of Corrections** (DOC) is a "public entity" within the meaning of Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131(1)(A) and Rehabilitation Act, 29 USCS 701 et seq.. Through legislative authority this public entity performs activities and operates programs – such as the Sex Offender Risk Assessment Committee (SORAC) and Sex Offender Pre-Release Staff (SOPRS) – that receives federal financial assistance.

35.     Defendant **Minnesota Sex Offender Program** ("MSOP") is an agency of the Department of Human Services.  MSOP is a "public entity" within the meaning of Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131(1)(A) and Rehabilitation Act, 29 USCS 701 et seq..  It is also a "program or activity that receives federal financial assistance" within the meaning of 42 U.S.C. §§ 2000cc-1 and 2000cc-5.

## C. INJURY TO THE CLASSES:

36.     SDP class defined.  Under Rules 23(a),(b)(2) and (b)(3), plaintiffs seek to certify a class consisting of all persons whom defendants confined pursuant to Minn. Stat. § 246B.01-02 (the "Class"), including those persons:

   a) Referred to the state's attorneys for commencement of proceedings under Minn. Stat. § 246B.01-02; or,

   b) Transferred to the Minnesota Sex Offender Program (MSOP) or other facilities for evaluation under Minn. Stat. § 246B.01-02; or,

   c) Confined at MSOP or other facilities for purposes of evaluation under Minn. Stat. § 246B.01-02; or,

   d) Punished for failing or refusing to incriminate himself in the evaluation conducted by a state official under Minn. Stat. § 246B.01-02; or,

   e) Detained and jailed pending a civil commitment proceeding under Minn. Stat. § 246B.01-02; or,

**f)** Committed to the indefinite custody of the Department of Human Services (DHS) under Minn. Stat. § 246B.01-02; or,

**g)** Confined indefinitely to the Minnesota Sex Offender Unit at MSOP by DHS under Minn. Stat. § 246B.01-02; or

**h)** Charged for the cost of care as a civilly committed sex offender admitted to the Minnesota Sex Offender Program involuntarily and indefinitely commitment as a "Sexually Dangerous Person" (SDP), as provided under Minn. Stat. § 246.01 Subd. 2b and/or Minn. Stat. § 246.52,

**i)** Denied minimal training; or,

**j)** Denied treatment in the least restrictive available facility or program; or,

**k)** Denied appropriate treatment in community placement; or,

**l)** Denied the same rights as afforded other persons committed to the Minnesota Department of Human Services; or,

**m)** Denied the *exculpatory evidence* that proves class members are not Mentally Ill or Sexually Dangerous by defendants; or,

**n)** Denied the right to reduce their arbitrary label and stigma that proves class members are no longer Mentally Ill and/or Sexually Dangerous by defendants; or,

**o)** Denied the right to reduce their arbitrary label and stigma that proves class members are not "Highly-Likely" to re-offend Sexually by defendants; or,

**p)** Denied the right to be free from official and legislative retaliation by defendants, when the law provides for class members to be at liberty; or,

**q)** Subject to the policies, practices and procedures under SOP including but not limited to:

1) Systemic violation of their constitutional rights to freedom of speech, assembly, religion, and petition in knowing and deliberate violation by defendants of the First Amendment of the United States Constitution;

2) Systemic violation and conspiracy of defendants to deny class members the constitutional right to Access the State Court(s) of Minnesota, and petition for their freedom in violation of the First and Fourteenth Amendment of the United States Constitution;

3) Systemic violation of their constitutional right *to minimal training* in knowing and deliberate violation by defendants of the Fourteenth Amendment of the United States Constitution;

4) Systemic violation of their constitutional right to confinement in the *least restrictive environment* in knowing and deliberate violation by defendants of the First, Fourth, Eighth, and Fourteenth Amendments of the United States Constitution;

5) Systemic violation of their constitutional right to be free from *preventive detention* in knowing and deliberate violation by defendants of the First, Fourth, Eighth, and Fourteenth Amendments of the United States Constitution; and,

6)   Systemic violation of their constitutional right to be free from purposeful discrimination in violation of the First, Fourth, Eighth, and Fourteenth Amendments of the United States Constitution. Deprivation of Due Process in Violation of the Fourteenth Amendment, Actionable through Sec. 1983, against defendants;

7)   Deprivation of Class Members Right to Equal Protection In Violation of The Fourteenth Amendment, Actionable Through Sec. 1983, against defendants; They argue that the distinctions as a "dangerous" or "civilly committed sex offender" are irrational and violate the Equal Protection Clause of the Fourteenth Amendment.

8)   State Created Danger in Violation of the Due Process Clause of the Fourteenth Amendment against defendants;

9)   Section 1983 Conspiracy against Tim Walz, Jodi Harpstead, Nancy Johnston, Marshall Smith, Keith Ellison, Dr. Elizabeth Peterson, Peter Puffer, Kevin Moser, Paul Schnell, Dr. Leal; Anoka County Health and Human Services Director, Ramsey County Health and Human Services Director, Sherburne County Health and Human Services Director, St. Louis County Health and Human Services Director, Goodhue County Health and Human Services Director, Dakota County Health and Human Services Director, Washington County Health and Human Services Director et.al

18

10)    Plaintiffs state a cause of action under Title II of Americans with Disabilities Act of 1990 (ADA), 42 USCS 12131-12134 and Rehabilitation Act, 29 USCS 701 et seq., class members bring 42 USCS 1983 claims of failure to train and failure to supervise under the ADA;

11)    Intentional Infliction of Emotional Distress (pain and suffering) against All Defendants.

12)    Plaintiffs state a cause of action for Municipal violation(s) in regards to the federal Monell Doctrine and Deshaney Doctrine.

13)    Plaintiffs state a cause of action for the Fourteenth Amendment Stigma-Plus violation.

37.    SDP Subclasses:  Within the class, plaintiffs allege the existence of other subclasses:

a) **SDP Juvenile Offender subclass defined:**  Under Rule 23(a),(b)(2) and (b)(3), plaintiffs Daniel Larsen, Matthew Wong, and Jeremy Asher, seek to certify a subclass of persons whom defendants confined at MSOP pursuant to Minn. Stat. § 246B.01-02, even though each of these plaintiffs and subclass members was a minor at the time of his referral, detention and/or confinement.

b) **SDP ADA subclass defined.**  Under Rule 23(a), (b)(2) and (b)(3), each of the above captioned plaintiffs including those similarly situated seek to certify a subclass of persons confined at MSOP under Minn. Stat. §

246B.01-02 who qualified as a person with a disability within the meaning of the Americans with Disabilities Act, 42 U.S.C.A. § 12102 and Rehabilitation Act, 29 USCS 701 et seq., and are not otherwise excluded from that definition pursuant to 42 U.S.C. § 12211. In this case the Minnesota Commissioner of Human Services receives federal funding for the American Indian subclass plaintiffs Joseph Goodwin, Guy Greene, August Kingbird, Austin Black Elk, Leslie Tallman, Donald Hill, Roland Brant, and Michael Rogers, who are enrolled members of a federally recognized tribe and are registered tribal members but defendants fail to provide for any funding as to the rehabilitation through drug and alcohol programming. Minnesota and DHS receives federal funding that is govern by law under M.S. § 254B., where it states: ***The Commissioner shall Reserve 15% of the American Indian Chemical Dependency Tribal Account***". However this federal funding is never provided to the American Indian plaintiffs in this case which is a clear violation of federal law stated in this complaint.

c) **SDP DOC Non-Treatment Participants subclass defined**:  Under Rule 23(a), (b)(2) and (b)(3), plaintiffs Guy Greene, Kevin Nelson, and August Kingbird seek to certify a subclass of persons whom defendants confine at MSOP pursuant to Minn. Stat. § 246B.01-02, even though each of these plaintiffs and subclass members was identified by the DOC to meet the referral for civil commitment and was denied sex offender specific

treatment by defendants solely based upon the length of their incarceration. The subclass states a claim under <u>42 U.S.C.S. 1983</u> for denial of procedural due process in the context of being committed to a psychiatric institution, plaintiffs demonstrate that they have a protected liberty interest in not being involuntarily committed to a psychiatric institution and that he was deprived of that interest without due process of law.

38. **Rule 23(a) prerequisites.** Each class that plaintiffs seek to certify meets the requirements of Rule 23(a)

a) **Numerosity.** The proposed class contains over 44 named plaintiffs and more than 150 members. Moreover, joinder is impracticable as to the class and each subclass because plaintiffs seek, among other relief, an injunction on behalf of current and future class members.

b) **Commonality.** There are questions of law and fact common to the proposed class and subclasses, including:

1) Whether defendants violated the constitutional rights of plaintiffs and the class under the First, Fourth, Fifth, Eighth, and Fourteenth Amendments of the United States Constitution;

2) Whether defendants violated the constitutional rights of Larsen, and Asher and members of the Juvenile Offender subclass under the Fourteenth Amendment of the United States Constitution;

21

3)   Whether defendants violated the federal statutory rights of the above

named plaintiffs and all those similarly situated and the ADA

subclass under the Americans with Disabilities Act (ADA), 42

U.S.C. § 12131(1)(A) and Rehabilitation Act, 29 USCS 701 et seq.,

4)   Whether defendants violated Minnesota Statutes and/or Probate

Courts Orders when they modified the program no longer providing

psychiatric treatment for plaintiffs diagnosed mental disorders,

5)   Whether defendants knowingly provided false testimony <u>under oath</u>

during various judicial hearings for the self-serving purpose of

continuing to confine Plaintiffs arbitrarily labeled and stigmatized as

"dangerous",  "sex offenders" , "highly likely to reoffend".

c) **Typicality.**  The claims of each plaintiff are typical of the claims of the

class and subclass that each plaintiff seeks to represent.  Each claim arises

from the same common course of conduct by defendants; each plaintiff, the

class, and subclasses are similarly affected by defendant's course of

conduct.  Accordingly, each plaintiff will fairly and adequately protect the

interests of the class and subclass that he seeks to certify.

d) **Adequacy.**  Plaintiffs' interest are coincident with, and not antagonistic to,

those of the proposed class and the subclasses. Plaintiffs are not represented

by an appointed counsel. Counsel who would be more competent and

experienced in the prosecution of civil rights, and class action litigation.

39.  **Rule 23(b)** requirements.  The proposed class and subclasses may be maintained under each subsection of Rule 23(b):

a) **Rule 23(b)(1) certification.**  Prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class.  It also would, as a practical matter, be dispositive of the interest of the other members not parties to the individual adjudications and would substantially impair or impede their ability to protect their interests.

b) **Rule 23(b)(2) certification.**  Defendants acted or refused to act on grounds that apply generally to the class and subclasses, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class and subclasses as a whole.

c) **Rule 23(b)(3) certification.**  A class action is superior to other available methods for fairly and efficiently adjudicating this controversy.  Not only do questions of law or fact common to class members predominate over any questions affecting only individual members, but also –

   1)  Class members have no means of effectively litigating their claims other than by way of certification as a class;

   2)  No other litigation is pending regarding this controversy;

3)   It is desirable to concentrate the litigation of the claims before this

court;

4)   The district court has the authority to appoint counsel to represent

plaintiffs as a means of mitigating the difficulties frequently associated

with managing serial pro-se petitions and/or complaints as those alleged

in the claims to be litigated in this action; and,

5)   First, in claims brought pursuant to 42 U.S.C. 1983, Larsen asserts

that the defendants have violated his right to equal protection by treating

him differently than similarly situated individuals; violated his right to

substantive due process by denying his right to minimal training; and

violated his right to procedural due process by denying him appropriate

placement under state law and depriving him of liberty.

40.   More shockingly if this court is provided with enough evidence the plaintiffs

would like to ask for a declaration by "the clearest proof" that the Sexually

Dangerous Persons statute has negated its civil intent and no longer serves the

legitimate government interest of treating mental disorders is unconstitutional

violating the Double Jeopardy and Ex Post Facto Clauses of the United States

Constitutions.

## IV.   BACKGROUND

## A. EVOLUTION OF STATE LAWS CONFINING SEXUALLY DANGEROUS PERSONS:

41.     In 1952, the National Institute of Mental Health ("NIMH") published a model

law, *Draft Act Governing Hospitalization of the Mentally Ill*, which established the

modern framework for civil commitment of the mentally ill.  NIMH's Draft Act

provided two alternative grounds on which the involuntary hospitalization of a

mentally ill individual might be ordered:  (1) the likelihood that the individual will

injure himself or others if he is not confined, and (2) the individual's need of

hospitalization and lack of sufficient insight or capacity to make responsible

decisions with respect to the question of hospitalization.  The Draft Act envisioned

a system of "indeterminate involuntary hospitalization" under "judicial control from

the beginning," providing for notice, hearing, and continual review of the propriety

of the confinement, and unfettered access to the courts for an institutionalized

person to seek discharge.  By the 1970s, nearly every state had enacted the salient

features of the Draft Act.

42.     As states enacted the NIMH's Draft Act, they repealed other statutes

classifying sex offenders as mentally ill.  At its height, in the late 1950s, more than

25 states had "sexual psychopath" laws, most of which had been enacted in the

1930s.  These early sex offender laws operated as an alternative to prison; they did

not provide for civil commitment following a prison sentence.  By the end of the

1980s, all but 12 states had repealed their "sexual psychopath" laws.

43.     The state of Washington reversed that trend in 1990.  Disturbed by two

sensational sex crimes in the late 1980s, and fueled by the public perception that the

criminal justice system failed to rehabilitate or incapacitate sexual predators,

Washington enacted the first modern Sexually Dangerous Person statute, Wash, Rev. Code § 71.09.020. Other states followed Washington, including Kansas, whose Sexually Dangerous Person statute was upheld by the Supreme Court in *Kansas v. Hendricks*, 521 U.S. 346 (1997). *Hendricks* held that the Kansas statute satisfied due process because its definition of "mental abnormality" was sufficiently clearly established to limit involuntary civil confinement to those offenders who suffer from a volitional impairment rendering them dangerous beyond their control. *Hendricks* emphasized that under the Kansas statute a person must either have been charged with and convicted of a sexually violent offense or found not guilty by reason of insanity.

44.     Five years later, *Kansas v. Crane*, 534 U.S. 407 (2002), clarified the requirement that a civilly committed sex offender must have a "mental abnormality" or "personality disorder" to satisfy due process.   To ensure that the confinement remains civil and not criminal, *Crane* held that the Sexually Dangerous Persons must be distinguishable from other offenders: "The severity of the mental abnormality itself, must be sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary case." 534 U.S. at 413.

45.     Today, 20 states have enacted laws providing for the involuntary civil commitment of Sexually Dangerous Persons.  Although substantially similar, there are important differences among these state laws.  For example, most states give the

accused Sexually Dangerous Person (SDP) a right to a jury trial on the question of civil commitment, five states, including Minnesota, do not. Nine states impose the more stringent "reasonable doubt" standard of proof to SDP commitment determination; Minnesota, among others, does not. And all SDP statutes – except for Minnesota – require that an SDP have been charged with or convicted of a predicate sex offense as a prerequisite for civil commitment. Only Minnesota subjects persons who have never been charged with a sex offense to civil commitment as SDPs.

## B. MINNESOTA ENACTS A STATUTE FOR CIVIL COMMITMENT OF SEXUALLY DANGEROUS PERSONS OTHERWISE KNOWN AS THE LINEHAN ACT;

46.     In 1994, in conjunction with the SPP Act, the legislature passed the law at issue in this case, the SDP Act. The Act of August 31, 1994, ch. 1, art. 1, 1995 Minn. Laws 1, 5-9 (codified at Minn. Stat. 253B.02, subd. 18c (1998)). The Minnesota Legislature convened a special session specifically to prevent Linehan's release. "*The reason we're here, one of the reasons we're here obviously is because Mr. Linehan is on the streets.*" Hearing Before the Joint Meeting of H. and S. Jud. Comm. and S. Crime Prev. Comm., 78th Minn. Leg., Spec. Sess., Aug. 24, 1994 (audio tape) (statement of Senator Ember Reichgott Junge, Chair of S. Jud. Comm.).

47.     Just eight days before the State's primaries, the Governor called for a special session unlawfully aimed at one man Dennis Darol Linehan. In just 97 minutes, the

legislature passed the SDP Act. Notably, the bill's drafters told their collegues not to talk about the Linehan case, warning that: "*Whatever we say on the floor will be used against us....It's going to be used to challenge the bill*"

48.     In the SDP Act, the legislature set out a three prong test for determining whether a person is Sexually Violent for purposes of civil commitment. (Minn. Stat. 253B.02, subd. 18c(a)).  Nowhere in the SDP Act did the legislature set forth the "*utter inability test.*"  However, the legislature stated that "*it is not necessary to prove that the person has an inability to control [his or her] sexual impulses.*" (*Id.* subd. 18c(b)).  Against this legislative history, Minnesota's State Court's held in *Linehan III* that the newly enacted SDP Act did not require "*proof that the proposed patient has an inability to control his or her sexual impulses*" in order to uphold civil commitment.  *Linehan III*, 557 N.W.2d at 179 (interpreting the SDP Act).

49.     Our court's then reviewed adequate grounds for civil commitment of mentally disordered and dangerous persons, and concluded that the SDP Act was enacted to protect the public from sexual predators with mental disorders "*who retain enough control to 'plan, wait, and delay the indulgence of their maladies until presented with a higher probability of success.*'" *Linehan III*, 557 N.W.2d at 182 (quoting *Linehan*, 544 N.W.2d at 318) (emphasis added).  *Linehan III* acknowledged that the SDP Act allows for commitment of individuals who do not lack total control over their harmful sexual impulses *but* have a degree of volitional impairment such that they are "*unable to control their dangerousness,*" as *Hendricks* requires.  557 N.W.2d at 182; *Hendricks*, 521 U.S. at 358.

50.    The "intent" becomes even clearer when viewed against the legislature shifting from the requirement that an *utter lack of control* be proven while remaining cognizant of the bounds of substantive due process.  Accordingly, the provision in subdivision 18c(b), stating that "*it is not necessary to prove that the person has an inability to control the person's sexual impulses*," reads very narrowly, as in the *Linehan III* decision, to mean only that the state does not need to prove that a person meets the *Pearson* utter inability standard, thus differentiating the SDP Act from the PP Act or its successor statute, the SPP Act.  Still, like the Kansas Act, the Minnesota SDP Act "*requires a finding of future dangerousness, and then links that finding to the existence of a 'mental abnormality' or 'personality disorder' that makes it difficult, if not impossible, for the person to control his dangerous behavior.* " *Hendricks*, 521 U.S. at 358; *see* Minn. Stat. 253B.02, subd. 18c(a).

51.    The State court arbitrarily claimed that such a reading harmonizes all parts of the statute and acknowledges the legislature's intent to abandon the "*utter lack of control*" test required for commitments under the SPP Act while insuring that the statute is narrowly tailored. (*Compare* Minn. Stat. 253B.02, subd. 18b, *with* Minn. Stat. 253B.02, subd. 18c; *see also Pearson*, 205 Minn. at 555, 287 N.W. at 302).

52.    While *Pearson* interpreted the PP Act to include an *utter inability to control* standard, our courts subsequently recognized that other grounds for civil commitment exist.  *See* Blodgett, 510 N.W.2d at 914 n.6 (allowing for breadth in civil commitment classifications in challenge to commitment under PP Act).

53.    Our courts now clarify that the SDP Act allows civil commitment of Sexually Dangerous Persons who have engaged in a prior *course of sexually harmful behavior* and whose present disorder or dysfunction does not allow them to adequately control their sexual impulses, making it *highly likely* that they will engage in harmful sexual acts in the future.  Shockingly, the state's own legal reasoning no longer holds true, as the class does not meet the "highly likely" standard under Minnesota law or remain a threat or danger to the community.  Defendants knew or should have known but failed to protect plaintiffs liberty interest in this case.

## C. THE EVIDENCE SUGGESTS THE MINNESOTA CIVIL COMMITMENT ACT HAS NEGATED ITS CIVIL INTENT AND NO LONGER IS SERVING ITS LEGITIMATE GOVERNMENT INTEREST.

54.    While the Legislature enacted the *Linehan* Act in 1994, codified today as Minn. Stat. § 246B.01-02, the SDP statute,  Legislators and the Attorney General described the bill as a "crime prevention measure" aimed at protecting children, and not for the purpose of treating SDPs.  Written submissions by the Office of the Attorney General, the bill's sponsor, acknowledged that an SDP's confinement was indefinite, and that treatment of SDPs was undeveloped and uncertain.

55.    The Attorney General's submissions also affirmed the uniquely broad sweep of the Act, acknowledging that a person need not be charged with or convicted of a sex offense to be used as a basis for finding that the individual has engaged in sexually predatory conduct – meaning minors, never charged with an adult offense,

30

may be referred for SDP proceedings and eventually civilly committed for life. In this sense the legislature has circumvented the criminal justice system under the guise of treatment when in fact these juveniles face a certain death under civil commitment.

56.    Since 1994, the Legislature intended the law to be more punitive and in doing so throughout the years the act has negated its remedial/civil intent. The State has accomplished this by directly singling out patients from MSOP who have won their liberty in State court(s) to deny them liberty and make it impossible for the typical recidivist to petition for his release from civil commitment in State court.

57.    Defendants accomplished this by either asking the State court to *legislate from the bench* or directly asking the legislature to amend the SDP statutes to prolong the lawful release of class members.  Plaintiffs seek a declaration that the Act has negated its civil intent and is therefore punitive in-fact violating plaintiff's right to liberty, substantive due process, double jeopardy and the ex post facto clause.

### D. DEFENDANTS ARE *DELIBERATELY INDIFFERENT* TO CLASS MEMBERS RIGHT TO LIBERTY BY REFUSING TO EXERCISE PROFESSIONAL JUDGMENT IN EVALUATING THE SDPS AGE FOR RELEASE:

58.    Shockingly, defendants knowingly confine approximately 194 SDPs who are in the age bracket of 36 to 45; 178 in the age bracket of 46 to 55; 199 in the age bracket of 56 to 65, and 91 who are in the age bracket of 66 and over.

59.    The average age of SDPs is 51 years old with the youngest being 25 and the oldest being 86.

60.     **R. Karl Hanson**, the founder of the Static-99 and 99R risk assessment
instruments, candidly acknowledges that the factor of increasing age, by itself,
outweighs the impact of all known factors that suggest a likelihood to recidivate.
This well-known and undeniable scientifically studied phenomenon defined as
'aging out' is best understood as the year-by-year reduction of sex-crime recidivism
from age 30 on, such that recidivism approaches zero percent from age 60 and on.
(*Id*. Karl Hanson), The Validity of Static-99 with Older Sexual Offenders, 2005-01
(Public Safety and Emergency Preparedness Canada): (p.5): "The average
recidivism rates steadily declined from 14.8% in the offenders less than 40, to 8.8%
for the offenders in their forties, 7.5% for offenders in their fifties, and 2.0% for
offenders greater than 60." (p. 10):

61.     According to P. Lussier & J. Healey, "Rediscovering Quetelet, Again: That
'Aging' Offender and the Prediction of Reoffending in a Sample of Adult Sex
Offenders," (26 Justice Quarterly, No. 4, p. 827 (2009)), flatly declares, "*by itself,
age at release showed a predictive accuracy comparable to that of the [entirety of
all factors of the Static-99]*." In their independent study, these authors found that,
past age 40, "after adjusting for the scores of Static-99, for every one-year increase
in age, recidivism rates dropped …4% for violent/sexual reoffending." (*Id*., p. 849).
Finding zero percent (0%) recidivism at age 60 or older (*See* Table 3, p. 840).

62.     Defendants either knew, or should have known, that statistics in current
literature finds that the most consistent data concerning overall risk, is age
regression. Science has proven a 61 year old sex offender has a very low risk to

recidivate.  Overall, consistent with Hanson's data, showed that average sexual

recidivism rates among released sex offenders declined abruptly past age 40.  (See

R. Karl Hanson, Recidivism and Age: Follow—Up Data From 4,673 Sexual

Offenders, 17 J. Interpersonal Violence 1046, 1059 (2002).

63.     Age is the number one predictor for accuracy of risk comparable to all other

Statistic Factors. Professional literature guides professional judgment standards as

applied to science when dangerousness to the public is considered, as: "For years it

was standard practice for experts to interpret rates as probabilities (or more

precisely, proportions were treated as probabilities, and percentages were treated as

likelihoods).  A reconvicted offender percentage of 52% tips above 50%.  Treating

the percentage as likelihood, means that offenders in the high risk category for the

Static-99 would have a 52% likelihood of becoming reconvicted offenders.  This

likelihood would be treated as sufficient for 'more likely than not' and thus high

enough to reach the 'highly likely' threshold." Referencing Dr. Daniel Montaldi

PhD – a Study of the Efficacy of the Sexually Violent Predator act in Florida, 41

Wm. Mitchell L. Review 780.

64.     The federal Court stated: "Instead, the court concluded that the Constitution

required the government to also prove that the defendant was dangerous, which the

court believed required evidence showing a five-year recidivism rate of at least

50%. Because the government's evidence fell short of that threshold, the district

court dismissed the government's petition. *See United States v. Wooden*, 887 f.3d

591, 596 (4th Cir. N.C., Apr. 10, 2018) (*See Wooden I*, 693 F.3d at 450.)"

65.    Based upon current science in Minnesota, anyone whose recidivism rate is 50% or less, is highly likely to "**not**" reoffend and can no longer be considered dangerous to the public.  Although defendants either knew, or should have known, of such scientific facts, they provide opinions from treatment providers whose assessments will stray from these standards of practice and scientific literature.

66.    **Dr. Deb McCulloch Ph.D**[2]., court expert in Wisconsin publicly stated: "What I can say is that if you look at the data in Wisconsin, there was a spike in 2009, 2010 of total discharges and that was related to changes in the actuarial assessments, in particular the development of Static-99R, which identified lower risks to re-offend; therefore, there were a number of people that were committed that no longer met the criteria.  They successfully petitioned the court after they were evaluated and were then subsequently discharged."

67.    While other civil commitment programs spiked in discharges in 2009-2010 due to changes in the Static-99, defendants remain deliberately indifferent to the constitutional rights of class member's liberty.  Despite the research showing Minnesota and Wisconsin are technically the same, and previous risk assessments were grossly overestimated.

68.    Defendants knowingly confine a large number of SDPs who have "aged out" and who should no longer be subjected to indeterminate civil commitment as their risk factor of reoffending is substantially below the 50% *highly likely* standard.

---

[2] Expert, Dr. Deb McCulloch Ph.D., Sand Ridge Secure Treatment Center – 1111 N. Rd. Mauston, WI 53948.

Defendants actions to not discharge any SDP once the SDP "ages out" and therefore has become a life sentence under the guise of treatment.

69.    Class members alleged that they have a state created liberty interest in being labeled and stigmatized as *highly likely* to re-offend sexually when it is not factually correct by professional judgment and the current forensic evidence.

70.    Class members have a state-created-liberty-interest in not being arbitrarily labeled or stigmatized as a "sexually dangerous person", or "highly-likely" to re-offend sexually in the future is false, there can be no *compelling state interest* to label or stigmatize class members as a sexually dangerous person or highly likely to re-offend other than to deprive class members of their fundamental right to liberty.

71.    For these reasons DHS/MSOP and defendants failed to: take all reasonable steps to ensure that any information about an offender that it uses is as accurate…as possible" as required by the exercise of "professional judgment". Therefore Defendants are in violation of class members Fourteenth Amendment right to Life, Liberty, and Due Process of law.

**E.  UNDER THE STATUTORY FRAMEWORK OF MINNESOTA'S SEXUALLY DANGEROUS PERSON STATUTE THE ACT HAS NEGATED ITS CIVIL INTENT VIOLATING DOUBLE JEOPARDY, EX POST FACTO AND SUBSTANTIVE DUE PROCESS.**

72.    Under the arbitrary scheme of Minn. Stat. § 253D.02 Subd. 16(a) "A "Sexually Dangerous Person" means a person who: (1) has engaged in a course of harmful sexual conduct as defined in subdivision 8; (2) has manifested a sexual, personality, or other mental disorder or dysfunction; and (3) as a result, is likely to

engage in acts of harmful sexual conduct as defined in subdivision 8. (b) For purposes of this provision, it is not necessary to prove that the person has an *inability to control the person's sexual impulses* is a legal sham without clinical or scientific reasoning to support the law.

73. Over the years the Act proved the legislatures "intent" when the law remained constitutionally *on its face*, trapping Minnesota citizens under its statutory scheme for detention without a sex crime such as plaintiff Larsen and class members. And more shocking over the years the Act proved itself by not providing for any equitable relief to correct an erroneous commitment or post-conviction relief to protect the citizens right to liberty and due process.

74. Due to the statutory conundrum in the Act the defendants and the Attorney Generals' office, paint the absurd result, that class members have their rights protected to liberty under the statutory release scheme called the Special Review Board, which is an arm of the Court of Appeals Panel ("hereinafter CAP").

75. Throughout the legislative history of the CAP, defendants acted in direct concert to *corruptly influence the legislature* and the three branches of Minnesota's government to keep the status quo of preventive detention of class members. And have "narrowly tailored" the Act to make it virtually impossible to use the State court process because of the political climate.

76. The statute, and other collateral changes to the commitment scheme, were aimed squarely at Dennis Linehan. *Linehan* became the focus, not just of the media and the Minnesota Legislature, but actually became a talking point in a contested

36

election for the position of the Ramsey County Attorney's office.  The legislative

history of SDP, including the open debates and the recommendations and legal

writings, tell us that the overwhelming urge to pass this new version of the PP/SDP

statute was a direct response to concerns about public safety. The statute was

needed to ensure the continued incarceration of Dennis Linehan. At times the word

"treatment" was mentioned, but always in passing, before the real issue, continued

confinement for reasons of public safety and deterrence, was again the focus.

77.    To recognize the truth of the above, we need to look at nothing other than the

legislation facts.  To ensure *Linehan*'s continued confinement, and the confinement

of the "Linehans" to follow. The legislature carefully looked at the former essential

element of proof that PP/SDP statutes normally carry.  That element is a showing

that the proposed committee truly harmed people.  They removed that element by

bringing forth the "*rebuttable presumption of harm*."  Minn. Stat. <u>253B.02</u>, subd.

7a(b). Put another way, certain acts create a *rebuttable presumption* that harm was

done and the burden shifts to the defendant to show "*I did no harm*." The

legislative background is honest and instructive to the intent.  It was conceded this

would be a virtually impossible burden for any proposed committee to bear; thus

insuring his indefinite commitment.

78.    In other words, by adding the *rebuttable presumption of harm*, the SDP statute

now summarily forecloses any person's chances of not being committed.  The class

suggest the statutory mandate of *rebuttable presumption* is a pure denial of

constitutional due process and, standing alone, even if there were no other problems with the statute, voids, on constitutional grounds, the SDP we examine today.

79.    But there are other problems with this statute. The defendants, acknowledging the viability of _Foucha,_ sets out the trial court's reliance on certain facts and testimony in the record to clear the hurdle that _Linehan_ must be both _mentally ill_, as well as _dangerous,_ before he can be committed as an SDP.

80.    The majority stated: A court-appointed examiner testified _Linehan_ does not presently exhibit a personality disorder, a sexual disorder, or a mental disorder, even though that expert had diagnosed _Linehan_ with an antisocial personality disorder in 1992. By contrast, a licensed psychologist testified _Linehan_ has an alcohol dependence (in remission), impulse control disorder, and an antisocial personality disorder and supported his commitment as a Sexually Dangerous Person. Another licensed psychologist also diagnosed _Linehan_ as a paraphilia with an antisocial personality disorder, and testified _Linehan_ is "_highly likely_" to engage in harmful sexual conduct. _Linehan_'s treating psychologist at the security hospital diagnosed _Linehan_ as having an antisocial personality disorder based on historical information. (emphasis added.) The experts in the medical community do not support the substandard diagnosis of antisocial personality disorder as grounds for a mental illness. Or a paraphilia...

81.    First of all, one court-appointed examiner found that although _Linehan_ had an antisocial personality disorder, he was not even mentally ill. The other experts quoted, each in turn, _Linehan_'s "antisocial personality disorder" as one of the

38

underpinnings to fit *Linehan* under the SDP model of mental illness.  Now let us revisit *Foucha* because our State courts cannot follow the Supreme law of land in *Foucha.*  The U.S. Supreme Court struck down as unconstitutional a Louisiana state statute allowing continued, indefinite confinement of a man found dangerous but possessing only an "antisocial personality." *Foucha,* 504 U.S. 71, 112 S. Ct. 1780, 118 L. Ed. 2d 437 (1992).  Based on the medical testimony in *Foucha,* the court found that "antisocial personality" was not enough of a true mental disease to qualify as one of the two constitutionally essential elements for indefinite commitment, to-wit: both "mentally ill" and "dangerous."  Id. 504 U.S. at 77-86, 112 S. Ct. at 1784-1788.  Now superimpose on the weak reliance of the state to commit *Linehan* as a SDP based on medical experts who continuously found *Linehan* to have an antisocial personality, the "*rebuttable presumption of harm.*"  The handwriting is not only on the wall, but chiseled in two inch high block letters; this new PP/SDP statute is so constitutionally infirm that it can no longer stand.

82.     The state cannot say with any degree of certainty that the medical testimony about *Linehan* would have convinced the U.S. Supreme Court to change the result in *Foucha.*

83.     Trial courts and appellate courts have for years analyzed, discussed, and made findings in hundreds of standard civil commitment cases. In these cases the issue is strictly about *mental illness*. These individuals are deemed incapable of taking care of themselves, and are a threat to themselves or others, and who need real medical treatment.  (Minn. Stat. 253B.09, subd. 1, 253B.02, Subd. 13(b)).

84.     Class members conclude that the Minnesota Sexually Dangerous Person

statute is unconstitutional when examined in light of the *Foucha* holding that a

dangerous person with an antisocial personality can be incarcerated for crimes

committed in the past, but can neither be incarcerated nor "medically confined" for

what he might do in the future. Further, the *rebuttable presumption of harm* built

into the Sexually Dangerous Personality statute directs our attention, like nothing

else can, to the fact that this statute is based purely on public safety concerns,

employs preventive detention, thus unlawfully incarcerating citizens in a secured

and locked non-medical facility, not for a crime, but for speculation. For these

reasons plaintiffs seeks a declaration that the Act violates double jeopardy and ex

post facto, concluding it manifested a preoccupation with punishment, rendering it a

penal law for double jeopardy and ex post facto purposes.

## F.  DEFENDANTS FAILED TO EXERCISE *PROFESSIONAL JUDGMENT* WHEN WAIVING SERVICES FROM A MEDICAL MODEL APPROACH: DEFENDANTS NO LONGER PROVIDE MENTAL HEALTH TREATMENT FOR PLAINTIFFS' SO-CALLED DIAGNOSED MENTAL ILLNESSES:

85.     The State of Minnesota has determined that it has a legitimate government

interest in identifying and treating those "sex offenders" who've been diagnosed

with both a *mental illness* and level of dangerousness to the public.  The State has

adopted a standard practice of utilizing the medical model approach when providing

treatment for individuals who've been  diagnosed with a mental illness as defined

within the Diagnostic and Statistical Manual ("DSM").

86.     Each class and/or subclass member has appeared before a Minn. Probate District Court Judge (civil division) whom has issued a Finding of Fact, Conclusion of Law, and ORDER for Indeterminate Civil Commitment ("Order") which subjected that individual to be indeterminately civilly committed based upon both a diagnosed mental illness, and level of dangerousness.

87.     Defendants retain the services of various licensed psychologist ("stakeholders") whom they've chosen to rely upon as qualified professionals. These qualified experts use the DSM - V for its intended purpose of evaluating/re-evaluating plaintiffs current mental illnesses.

88.     Defendants knew or should have known that every class and/or subclass member while being observed do not show evidence of any symptoms in relation to a mental illness requiring psychiatric care and treatment.

89.     When defendants made the choice to exercise their *professional judgment* to break away from a well-established medical model approach (Rule 36 - serving those who are diagnosed with a mental illness), defendants identified that each member of the class and/or subclasses mental illnesses had sufficiently subsided enough to no longer require continuous psychiatric mental health treatment.

90.     Defendants used their *professional judgment* to implement a cognitive behavioral treatment program (Rule 26 - which also required the defendant(s) to incorporate a waiver of services in order to make that type of treatment fit their non-medical treatment model) identifying that the only relative treatment concern, pertaining to the class and/or subclass members, is their *level of dangerousness*.

41

This is a treatment issue which has knowingly been treatable in any least restrictive setting for the typical criminal recidivist.

91.    Plaintiffs allege that once defendants identified that a class or subclass member no longer required the type of services for treating the classes diagnosed mental disorders/illnesses, they identified that plaintiff disorder/illnesses was an insufficient justification for continuous detention of that class and/or subclass members as defined within Minn. Stat. §246B.01-02 a.k.a. SOP.

92.    Defendants are without evidence that plaintiff is demonstrating any of the behavioral elements which meet the criteria of the statutory definition of mental illness.  Once defendants chose to utilize their professional judgment to break away from the medical model approach, deciding to no longer provide psychiatric mental health treatment to its dangerously mentally ill sex offenders, defendants also acknowledged that the class and/or subclass members mental health needs were no longer the legitimate governments interest.

93.    Defendants have also demonstrated an inability to make up their minds regarding whether plaintiffs in fact have a "mental disorder/illness" or "**not**". Defendants, when providing sworn testimony, stated under oath and gave the court "*pause*" when testifying "SPP and/or SDP patients confined within the MSOP facility are not "mentally ill"". *Hince v. O'Keefe*.

94.    The Minn. Supr. Ct. stated "The state's argument gives us "pause" because, when the state argued *Blodgett, Linehan I, Linehan III, and Linehan IV*, it argued that the parties suffered from *mental disorders*. We then upheld SPP and SDP

commitment procedures as satisfying due process standards because the individuals committed under these procedures suffer from *mental disorders. Linehan IV, 594 N.W.2d at 878; Linehan III, 557 N.W.2d at 184; Blodgett, 510 N.W.2d at 916.*

95.     Plaintiffs also incorporates the premise that upon defendants determination and failure to provide any psychiatric mental health treatment for any of the diagnosed DSM – IV and/or V mental illnesses, defendants knowingly acknowledged that plaintiffs mental disorders are no longer severe enough to mandate psychiatric treatment, and/or continued detention in the most secure treatment environment – "MSOP".

96.     Plaintiffs allege that defendants are not providing psychiatric mental health services for the class and/or subclass members.  It is the defendants who've identified that plaintiffs are not suffering from a mental illness which was medically justified for continuous services at the SOP.  It is also the very same defendants who've utilized *their professional judgment* to identify that the class and/or subclass members no longer require medically justified care for providing psychiatric treatment of a diagnosed mental illness.  Such a determination by defendants renders further supervision unnecessary within the SOP's secured treatment facilities.

97.     For these reasons Defendants have collectively violated plaintiffs Fourteenth Amendment substantive right to minimal training and to liberty.

## G. SECTION 1983 LIABILITY FOR FOURTEENTH AMENDMENT CONSTITUTIONAL VIOLATIONS

43

98.     Plaintiffs allege that the personal involvement of the following defendants

Tim Walz, Jodi Harpstead, Nancy Johnston, Marshall Smith, Keith Ellison, Dr.

Elizabeth Peterson, Dr. Crystal Leal, Peter Puffer, Kevin Moser, and Paul Schnell

violated class members fundamental right(s) because they remain deliberate

indifferent to the failure to train or supervise their employees to legal and forensic

evidence readily available in civil commitment matters.

99.     Plaintiffs seek to impose liability on defendants under 1983 Liability because

that "action pursuant to official municipal policy" caused their injury. As for failure

to train, defendants are held responsible for failing to train because they knew or

should have known that the training practices were inadequate, the failure to

provide further training was deliberate, and a deficiency in the training actually

harmed each of the plaintiffs.

## H. DEFENDANTS ARE ENGAGED IN DISPARAGING TREATMENT UNDER MINN. STAT. § 253.21:

100.    Between 1997 and 2013, DHS recommended the discharge of no SDPs from

confinement at either of their MSOP facilities based on special circumstances

involving age or disability. Shockingly defendants knowingly and intentionally

denied gravely ill cancer patients, being confined within MSOP, their right to

liberty despite no legitimate threat to public safety.

101.    Under Minn. Stat. § 253D.27 Subd. 2 A petition for a reduction in custody or

an appeal of a revocation of provisional discharge may be filed by either the

committed person or by the executive director and must be filed with and

considered by a panel of the special review board authorized under section 253B.18, subdivision 4c. A committed person may not petition the special review board any sooner than six months following either: (1) the entry of judgment in the district court of the order for commitment issued under section 253D.07, subdivision 5, or upon the exhaustion of all related appeal rights in state court relating to that order, whichever is later; or (2) any recommendation of the special review board or order of the judicial appeal panel, or upon the exhaustion of all appeal rights in state court, whichever is later. The executive director may petition at any time.  The special review board proceedings are not contested cases as defined in chapter 14.

102.    In reality , these petitions were rarely granted, and never considered in a timely manner and often were politically motivated.  An inmate can wait years for his "annual petition" to be submitted to a state court; these delays are typically the result of various stakeholders inability to complete their assessments in a timely manner. Moreover, while there is forensic evidence that came about that the Special Review Board needed forensic training, the SRB continues to only focus on "*Dangerousness*" which chills the rights of Minnesota's civilly committed sex offenders.

103.    In light of the fact that the reduction in custody panels due not review or contest treatment decisions or decisions made by MSOP staff for continuous psycho-educational treatment without a mental illness.

104.    In reality, as described below, inmates confined by DHS to a secure treatment facility – including plaintiffs here – are stripped of every material right afforded to

45

non-SDP patients confined in other secure treatment facilities.  DHS operates the

Minnesota Sex Offender Program as a strict penal facility that provides

substantially fewer services, facilities, and privileges to SDPs than those currently

afforded to inmates imprisoned throughout the Minnesota DOC, and/or other secure

treatment facilities.

## I.  DEFENDANTS CONSTRUE THE SEXUALLY DANGEROUS PERSON STATUTE AS A POLICY OF PREVENTATIVE DETENTION:

105.    As outlined above, the DOC initiates SDP commitments.  Its End-of-

Confinement Review Committee (ECRC), in consultation with other state officials

who comprise the Sex Offender Risk Assessment Committee (SORAC), picks

inmates and/or confined juveniles for referral to the state's attorneys for SDP

commitment proceedings.  Until 2013, DOC relied on the Minnesota Sex Offender

Screening Tool – Revised ("MnSOST-R") to select inmates for referral.  The

MnSOST-R is an actuarial assessment designed to predict the probability that an

individual will commit a sex offense in the future.  It produces a score ranging from

1 to 16.

106.    Between 1997 and 2004, DOC referred an inmate for SDP proceedings if he

scored 12 or higher on MnSOST-R' 16 point scale.  But that practice, and the entire

system, radically changed after the murder of Dru Sjodin in 2003.

107.    On November 22, 2003, Dru Katrina Sjodin, a 22-year old student at

University of North Dakota (UND), was abducted from the Columbia Mall parking

lot in Grand Forks and then murdered by Alfonso Rodriguez, Jr., a registered sex

offender. Rodriguez had recently been released from a Minnesota prison after serving a 23-year prison sentence for kidnapping, assault and rape. Dru Sjodin's badly decomposed body was not discovered until April 2004 in Crookston, Minnesota.

108.    It is difficult to understate the effect that Dru Sjodin's murder by Rodriguez had on the public and governmental officials. Dru Sjodin was an attractive young woman working her way through University of North Dakota ("UND") by holding down two jobs. Thousands helped search for her. The local media and several national news outlets covered the story for months. Hundreds of people attended her funeral. UND created a scholarship in her name. Her hometown established a memorial garden to honor her. Rodriguez was prosecuted by North Dakota's United States Attorney Drew Wrigley, who sought the death penalty, a sentence unavailable in North Dakota or Minnesota and rarely sought by federal prosecutors. It was the first death penalty case tried in North Dakota in a century. Rodriguez was convicted and sentenced to death. Today, the United States Department of Justice's website of sex offender data is officially known as "The Dru Sjodin National Sex Offender Public Website."

109.    Although sex offenders have long been the most despised of criminals, Dru Sjodin's murder galvanized politicians and public officials as never before. Minnesota officials were excoriated: How could someone like Rodriguez not get civilly committed following his prison sentence for abduction, deadly assault and rape? The reaction of public officials in Minnesota was swift and profound.

Defendants needed to effectively ensure that Minnesotan sex offenders would remain locked up for as long as possible and swiftly enacting the Minnesota Commitment and Treatment Act as a means to impose a death by hospitalization. In January 2004, Governor Pawlenty created the Governor's Task Force on Violent and Sexual Offenders. Pawlenty personally chaired the task force, which consisted of judges, prosecutors, legislators, DOC and NDSH officials, and victims' rights representatives. The stated goal of the task force was to devise policies that "closed a gap related to higher risk sexual offenders who have completed their criminal sentences and are not referred for civil commitment." The task force recommended – and DOC and other state officials, acting through the SOPRS and SORAC committees swiftly implemented – a policy of referring for commitment proceedings any inmate who scored 8 or higher on the MnSOST-R's 16 point scale. The number of persons subjected to SDP proceedings under the State's new referral policy tripled overnight. The SDP statute's original intent – preventive detention to reduce crime against children by incapacitating potential sex offenders – became the explicit policy of the State of Minnesota. This effectively became a death by hospitalization for every Minnesotan sex offender, once he was civilly committed.

110.    Looking back, some state officials now concede that the State's adoption of an explicit preventive detention policy in the wake of Sjodin's murder may have been an overreaction. The DOC today acknowledges, "It appears likely…that unsupported fears about sex offenders and poorly thought out policies and procedures may lead to casting too wide a net in the commitment process." But

long before DOC's acknowledgement, the State had taken steps between 2004 and 2014 to transform MSOP's SDP unit from a hospital into a penal facility.

111.    Each plaintiff and the class were subject to the State's preventive detention policy. Each of the practices adopted pursuant to the State's preventive detention policy was unlawful, violating clearly established constitutional principles. DOC and DHS – including their executives named as defendants – knew or should have known that the practices adopted pursuant to the State's preventive detention policy violated clearly established constitutional proscriptions.

## J.   MSOP FACILITIES ARE NOT HANDICAP ACCESSIBLE & VIOLATES THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12131, *ET SEQ.*:

112.    With passage of the SDP statute, the DHS confronted a unique challenge:  It was required to confine and treat a new kind of patient – sex offenders being released from prison and many with disabilities.  DHS decided to house all SDPs in the Minnesota Sex Offender Program at Moose Lake and the Minnesota State Hospital in St. Peter, where it has continually operated its' SOP services.  All persons admitted or evaluated as SDPs enter and remain confined in the SOP program housed in the designated MSOP facilities without respect to the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.*.

113.    Until 2006, the St. Peter Building was a multi-use building.  The Pexton buildings housed DOC's MSOP prográm and intake unit housing unit.  Two events in 2005 sped the transformation of the Moose Lake Complex into a penal facility.

49

The first was the dramatic growth in the SDP population in the wake of Dru Sjodin's murder. By 2005, SOP had taken over the entire building, pushing out the DOC treatment programs. The second event was an escape by an SDP. Although the SDP was apprehended immediately, the State required DHS to adopt penal regulations governing SDP housing. In 2007, the Legislature mandated that the DOC contract with DHS to complete the transformation of the St. Peter and Moose Lake Building(s) from a hospital into a prison rather than conforming to the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.*.

114.   Under DOC's direction, DHS implemented prison regulations and procedures and installed prison-type security features in its building(s), rather than adopting handicap accessible facilities and federal programming. It replaced the windows with security glass, installed cameras and sally ports, limited access throughout the building through a system of interlocking doors controlled by a central guard station, installed fences enclosing the tiny outdoor recreation areas, topped that fence with razor wire, imposed a prison-style classification system, required GPS ankle bracelets, assigning SDPs to different, self-contained housing units, and promulgated a rigorous set of behavioral rules, copied from the DOC's manuals. Defendants still today have failed to conform to the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.* and provide the necessary federal resources for adequate programming and rehabilitation.

115.   Plaintiffs – except for minors committed as SDPs – who do not know prison. Most either served a prior prison term at any one of the MN-DOC facilities located

in Oak Park Heights (OPH), Stillwater Correctional Facility (STW), or Rush City

(RC), Moose Lake, Fairbault, and Lino Lakes were referred directly from those

penal institutions to DHS for commitment as a SDPs. Each plaintiff prefers

incarceration in a DOC prison[3] over confinement by DHS as an SDP.[4] Every

material aspect of a SDP's confinement at MSOP is calculated to achieve the most

restrictive, arbitrary and deprivation of federal funding as possible. The following

allegations describe some, but not all, of the unlawful violation of the Americans

with Disabilities Act, 42 U.S.C. § 12131, *et seq.* imposed upon each plaintiff during

his confinement as an SDP inside the Minnesota Sex Offender Program:

116.    Unlike inmates at DOC who receive their prescription medications from

outside licensed physician, MSOP's nurse practitioner(s) either denies the

prescribed medication; due to cost, or changes the prescription based upon their

opinion and/or the need of the facility MSOP.

---

[3] In referring to "DOC prisons," plaintiffs mean DOC's principal penal facilities, the Oak Park Heights (OPH), Stillwater Correctional Facility (STW), or Rush City (RC), Moose Lake, Fairbault, and Lino Lakes. Although a neutral observer would assume that any of DOC's medium security facilities, the Moose Lake, Fairbault, or Lino Lakes, would be the logical comparator to MSOP's SVP unit and MSOP programming, none of the SVP's housed at MSOP cite any medium security facility in their comparisons.

[4] Although unusual, this opinion is universal. In dozens of interviews of SVP's over the past eighteen months, each SVP volunteered that civil commitment as an SVP was much more punitive and arbitrary than incarceration in a DOC prison as a convicted felon. SVPs opine that the source of this unusual phenomenon stems largely from the lack of training and professionalism of MSOP staff and the scarcity of resources allocated to the MSOP program. They observe that while DOC operates prisons where staff is highly trained and well supervised, MSOP staff lacks similar constraints. This contrast leads to the truly bizarre situation in which a plaintiff will in some instances express genuine joy at the prospect of being remanded back into the custody of the DOC. There is a stark contrast between DOC prisons and MSOP's facilities.

117.    Unlike inmates at DOC, a non-treatment participating SDP can obtain limited

work access to up to eight hours of work per week at minimum wage.  SDPs who

are in full treatment compliance (Phase II) can obtain up to eighteen hours a week

work eligibility, with an additional six hours upon the request/approval of a MSOP

staff.  DHS/MSOP staff initiate a 50% cost reduction of a SDPs bi-weekly wages

earned.  SDPs who have received approval for MSOP's Community Preparation

Services (CPS) are awarded the full amount of pay earned during the bi-weekly

period.

118.    Work privileges are arbitrarily withdrawn by MSOP staff as a means of

additional  punishment.

119.    Unlike inmates at DOC, plaintiffs' movement within the facility is restricted.

Now with the COVID-19 pandemic plaintiffs sleep and treat within the walls of

their assigned secured housing unit.  Many are limited to a small yard, enclosed by

barb wired fences.  Plaintiffs are reprimanded if staff observe them communicating

to other SDPs through closed windows.  Defendants have consistently fashioned

various form of practices (i.e. GPS tracking, Tier Level System) which would

impose restrictions of plaintiffs movement within the facility. Although there is

federal relief for the Covid-19 pandemic MSOP fails to accommodate these

resources. On information and belief, because class members are labeled and

stigmatized as civilly committed sex offenders defendants work in direct concert to

deprive each class member federal services.

## K. DEFENDANTS HAVE SUBSTANTIALLY BURDEN PLAINTIFFS ACCESS TO THE COURT

120.    Unlike inmates at DOC, plaintiffs' access to the courts is severely limited. Plaintiffs have no access to a law library and the legal computer is limited to one hour a day.   MSOP staff confiscate SDPs' legal papers, identifying/labeling them as contraband.  For example, a named plaintiff, was provided material by the Minn. Court of Appeals which contained easily removable metal tabs.  The MSOP's mailroom staff opened the envelope, outside this class members presence, then determined that the entire legal document would be deemed contraband.

121.    Another plaintiff requested an extra tub to use as a legal bin and was denied. This class member sought the assistance from his court appointed legal counsel who requested an extra legal bin be provided to his client and was denied by defendants. Defendants identified both to plaintiff and his court appointed attorney that had he been charged with a criminal offense, he would have been approved, and provided, with an extra bin to explicitly use for storing legal materials.

122.    Unlike inmates at DOC, plaintiffs' access to commissary is strictly limited. SDPs confined to the High Security Area or East Observation Area disciplinary/detention cells are denied any commissary privileges.  Plaintiffs confined to Unit Omega 1 and 2 are permitted to order paper, envelopes, and limited hygiene items.  Plaintiffs confined to unit Omega 3 are allowed to order the same, as well as a limited number of food items, on a weekly basis.

123.    Unlike inmates at DOC, plaintiffs' length of confinement is indefinite and much of that is contingent on plaintiffs Access to the Courts.  The possibility of release from confinement is largely dependent on plaintiffs' compliance with minor, arbitrary or draconian MSOP staff rules and directions that hinder access to the courts.

124.    Unlike inmates at DOC, plaintiffs' are deprived of any rudimentary sense of privacy. Plaintiffs are subject to constant monitoring.  MSOP staff point cameras into certain cells to harass plaintiffs, watching them around the clock and waking them in the middle of the night under pretext of a security check.  MSOP staff confiscate and review personal letters and legal materials.  MSOP staff also may review any written correspondence sent by a plaintiff.  Staff demand that plaintiffs disclose the contents of their personal conversations.  Like inmates at DOC, MSOP staff restrict/monitor visitation, including visits by counsel and clergy, censor mail and monitor all telephone calls.

125.    Unlike inmates at DOC, DHS charges plaintiffs for their confinement, including their medical care.  DHS's billing records are, however, inaccurate and misleading, including references to individual treatment services provided by MSOP.   Class members and/or subclass members with insurance coverage are unable to obtain payment from their insurers.

126.    Currently, DHS bills SDPs approximately $12,000 per month for "room and board".  The handful of plaintiffs and SDPs who have been released from MSOP get bills for services amounting close to or more than one million dollars.  Class

and/or subclass members regularly receive a bill in amounts well over $100,000.00
for time spent at MSOP.

127.    Defendants submit billing documentation as though class and/or subclass
members are being confined within an "Institution for Mental Disease" ("IMD" (i.e.
St. Peter state hospital, or Anoka state hospital)) which actually serves those
suffering from a current mental illness.

128.    Unlike inmates at DOC, MSOP staff punish behavioral violations in a
haphazard and arbitrary manner.  Violations are classified as minor or major, with
significantly different penalties, based on the whim of the MSOP staff member
writing the notice of violation.  Plaintiffs are unable to predict the nature and
severity of punishment applied to any particular form of misbehavior.  These write-
ups are often cited as a basis for denying plaintiffs the opportunity to progress in his
treatment, which in turn is used as basis for denying a recommendation for release
at a SRB hearing.

129.    Unlike inmates at DOC, plaintiff are subject to mistreatment by MSOP staff as
a means of coercing future conduct.  A plaintiff may be deprived of property, work,
recreation privilege, or treatment.  Electronic games are regularly used by staff as a
means of leverage:  Staff confiscate individual gaming systems and frequently deem
the item contraband without identifying how the item became a security threat.
Once the gaming system is outside the secure perimeter it will not be allowed back
into the facility.  Class and/or subclass members are denied access to personal
computers, peripherals, and the internet.

130.    Unlike inmates at DOC, MSOP staff punish behavioral violations in a

haphazard and arbitrary manner.  Defendants created the tier level system in which

defendants can impose other forms of restrictions of services upon plaintiffs for

policy violations.  These violations are already classified as minor or major, with

significantly different penalties and the tier level system imposes these same

restrictions of services for an extended period of time.  Plaintiffs are unable to

predict the nature and severity of restrictions of services applied to any particular

form of misbehavior.  These write-ups are often cited as a basis for denying

plaintiffs the opportunity to progress in his treatment, which in turn is used as basis

for denying a recommendation for release at a SRB hearing.

131.    DHS and MSOP—including their executives named as defendants—subjected

each plaintiff and members of the plaintiff class to each of these practices and

conditions in violation of their *professional judgment* .  Each of these practices or

conditions of confinement are unlawful both as compared to the State's treatment of

its imprisoned felons and as measured against clearly established constitutional

principles of law.  DHS and MSOP—including their executives named as

defendants—knew or should have known that each of these practices violated

clearly established constitutional proscriptions.

## L. DEFENDANT'S UNLAWFUL DENY PLAINTIFFS MINIMAL TRAINING:

132.    DHS, MSOP and County level HHS Defendants are calculating non-medical

services provided to plaintiffs as if they are being confined in an Institution for

Mental Disease. The taxpaying public and subclass members are being financially held accountable for the outrageous costs of psychiatric services. Defendants are, in actuality, only providing psycho-educational classes that could be readily provided in society. Non-medical programming only serves to prolong institutionalization, segregation, and unnecessary hospitalization of each plaintiff's period of confinement pursuant to the State's policy of preventive detention.

133.   Defendants actions are knowingly violating the public trust of Minnesotan taxpayers who are being deceived into believing that DHS, MSOP and County level HHS defendants are providing greater services that what's actually being provided.

134.   The psycho-educational programming provided to SDPs at MSOP is wholly inadequate for that purpose, failing to conform to acceptable professional practices and standards within the medical profession. In fact, every aspect of MSOP's programming is lacking and designed specifically to prolong an SDP's confinement at MSOP. The State's unwritten preventive detention policy effectively commits a sex offender to a life of incarceration until death occurs.

135.   SDPs only receiving psycho-educational classes by an assigned primary therapist once a week. The only other form of services being provided at MSOP is group sessions for cognitive behaviors. These sessions last for two hours, during which an SDP is expected to recount events and emotions surrounding rule breaking behaviors. SDPs are assigned to treatment group based on their institutional behavior and their willingness to confess to the sex crimes or misconduct that MSOP staff believe an SDP may have committed.

136.    An SDP's mental condition or current observable behaviors has little bearing

on the cognitive group to which he is assigned, the course of his treatment, or the

manner in which he is treated or counseled by MSOP staff.

137.    Instead, success in treatment depends largely on an SDP's willingness to

confess to sexual deviant behaviors that the MSOP staff alleges he has committed.

No SDP receives psychiatric treatment for their underlying mental illnesses or

mental defect for which he was originally committed.

138.    Plaintiffs allege that there is evidence that MSOP staff are not forensically

trained to provide psychiatric mental health services for a diagnosed mental

disorder.  MSOP treatment staff have admitted that they do not have any training or

lack the education to provide services specifically addressing the mental disorders

of SDPs.  In fact there are no onsite psychiatrists currently available within the

MSOP-ML facility.

139.    Critical treatment decisions are often subjective and frequently left to feedback

by other SDPs. The determination whether an SDP may advance in treatment at

certain stages is dependent upon an unanimous consensus among other treatment

group members. If one group member decides to veto an SDP's advancement, then

the SDP in question remains trapped at that level of treatment regardless of the

needs, compliance, or success in treatment.

140.    There are no recognized milestones to measure treatment success.  MSOP

provides no certificates of completion as the SDP advances through the MSOP

cognitive programming.  Instead, continued advancement is determined solely at the

discretion of MSOP staff and determined on the SDP's compliance with staff
direction, no matter how unreasonable or counter-therapeutic.

141.   MSOP staff are not trained to follow their own policies and/or procedures.  In
fact MSOP staff can strip an SDP of years of advancement through the MSOP
program, denying him any hope of release from confinement, based on any
institutional infraction that MSOP staff want to write without due process.
Plaintiffs have no recourse to challenge these demotions, which are tantamount to
adding years to a sentence of imprisonment.

142.   DHS and MSOP-including their executives named as defendants—subjected
each plaintiff and the class to each of these unlawful practices and services. Each of
these practices or services are unlawful—whether compared to the State's treatment
of its other similarly situated, civilly committed patients, detainees, and/or DOC
prisoners measured against clearly established constitutional principles. DHS and
MSOP—including their executives named as defendants—knew or should have
known that the conduct as alleged throughout this action violated clearly established
constitutional proscriptions.

## V. CONSTITUTIONAL FRAMEWORK FOR EVALUATING DEFENDANTS' CONDUCT

### A. THE NATURE, CONDITIONS, AND INDEFINITE DURATION OF PLAINTIFFS' CONFINEMENT:

143.   **Fundamental rights/Due Process**. Admissions to the SOP as an SDP has
deprived each plaintiff of his fundamental constitutional rights.  Once subjected to

the SDP statute, and confined pursuant to its various provisions, a plaintiff suffers a massive curtailment of liberty, depriving him of his most basic and fundamental rights, including the right to be free from unwanted restraint. He loses every aspect of his personal autonomy. As an SDP, a plaintiff may not—as he sees fit—work, travel, speak, write, eat, sleep, wake, buy, sell, read, possess property, exercise, marry, procreate, communicate or form intimate personal relationships with others. Defendants' deprivation of each plaintiff's constitutional protections. Defendants must demonstrate a necessary relationship between their conduct and the advancement of a compelling state interest. Defendants do not have a *compelling state interest* to impose a death by hospitalization upon plaintiffs.

144. **Suspect class.** SDPs are a discrete, insular, and despised minority who—by statutory definition—are diseased with an involuntary defect. They comprise a well-defined minority that is voiceless, friendless, and relegated to political powerless. Defendants subject SDPs to knowing, purposeful, and unequal treatment in comparison to similarly situated persons. Because defendants' conduct discriminates on the basis of a suspected classification, defendants must demonstrate a necessary relationship between their conduct and the advancement of a *compelling state interest*.

145. For instance the arbitrary label and stigma attached by the government to call class members (civilly committed sex offenders) "highly-likely" to re-offend in the future is false and there is no *compelling state interest* to label or stigmatize class members other than to deprive them of their fundamental right to liberty. Therefore

60

without a *compelling state interest*, defendants are in violation of class members Fourteenth Amendment right to Life, Liberty, and Due Process of law.

146.    Moreover defendants use minor acts of misbehavior – bad attitude, talking back, or joking with MSOP staff –cited in "Incident Reports" and/or "Communication Logs" as a basis for denying an SDP release from confinement or delaying promotion to the next level of treatment, including tier level advancement. Class members have Liberty Interest in defendants exaggerated responses to security.

147.    Under either theory of constitutional scrutiny, defendants violated plaintiffs' constitutional rights.  Under each theory, the State, its agencies and executives named as defendants knew or should have known that their conduct violated clearly established standards of constitutional conduct.

## B. DEFENDANTS' CONFINEMENT OF PERSONS SIMILARLY SITUATED TO PLAINTIFFS

148.    The State operates two systems of confinement.  It imprisons offenders based on their misbehavior resulting in a criminal conviction for violation of the State's criminal penal code.  It also civilly commits persons based on their psychiatric mental condition resulting in a determination of dangerousness.  Although each system serves different purposes and operates in accordance with different procedures, each system results in confinement.  Within these procedures of confinement, the State discriminates against SDPs in the nature, purpose, duration, and conditions of their confinement. That purposeful discrimination cannot stand.

149.    **Penal Confinement.** The State operates a criminal justice system. The Minnesota Criminal Code, ("M.C.C."), Chapter 609, establishes "a system of prohibitions, penalties, and correctional measures to deal with conduct that unjustifiably and inexcusably causes or threatens harm to those individual or public interests for which government protection is appropriate." M.C.C. § 609.01. The statutory purpose of the criminal code (1) to protect the public safety and welfare by preventing the commission of crime through the deterring effect of the sentences authorized, the rehabilitation of those convicted, and their confinement when the public safety and interest requires; and    (2) to protect the individual against the misuse of the criminal law by fairly defining the acts and omissions prohibited, authorizing sentences reasonably related to the conduct and character of the convicted person, and prescribing fair and reasonable post- conviction procedures. M.C.C. § 609.01 Subd. 1 (1) The criminal code proscribes certain sexual conduct and subjects that misconduct to punishment as crimes. M.C.C. 609.342. Pursuant to the Minnesota Criminal Code, the State arrests, charges, prosecutes, convicts, sentences and incarcerates—in the custody of the DOC for a prescribed period of time—sex offenders.  As required by the federal constitution and a variety of state laws, the State affords substantial procedural rights and privileges to persons it prosecutes and seeks to confine as offenders for violation of its criminal code.

150.    M.C.C. 609.02 Subd. 7, defines "Bodily harm" means physical pain or injury, illness, or any impairment of physical condition.

151.    **Civil Confinement.** The State also operates a bifurcated civil commitment

system. First, under Minn. Stat. § 253.21, the State may involuntarily commit

"persons requiring treatment".  The statutory purpose of Chapter  Minn. Stat. §

253.21 (civil commitment of persons requiring treatment) is to promptly treat

mentally ill persons, to safeguard their rights, and to encourage community care

instead of institutional confinement. Second, under Minn. Stat. §246B.01-02, the

civil commitment statute, the State's SDP statute proclaims no statutory purpose,

although public safety is the only purpose uniformly and consistently identified by

state officials.

*Defendants discrimination between inmates imprisoned by DOC and Sexually*
*Dangerous Persons confined by DHS.*

152.    Although DOC inmates and plaintiffs are similarly situated in the nature of

their confinement, defendants provide significantly greater procedural and

substantive rights, protections, and privileges to criminal defendants and to DOC

inmates than to plaintiffs confined as SDPs.  The State exploits this disparity in two

ways: First, as documented by the Legislative Council and reflected in emails,

state's attorneys use the State's SDP system to circumvent the constitutional

protections afforded criminal defendants, securing indefinite confinement by DHS

where prosecutors lack evidence to win a criminal conviction and imprisonment by

DOC. Second, as described above, the DOC treats similarly situated inmates better

than the DHS treats SDPs. This disparate treatment by defendants of similarly

situated confined persons cannot stand no longer.

63

153.   When Minn. Stat. § 609.165 was enacted in the state of Minnesota it provided

that "*When a person has been deprived of civil rights by reason of conviction of a*

*crime and is thereafter discharged, such discharge shall restore the person to all*

*civil rights and to full citizenship, with full right to vote and hold office, the same as*

*if such conviction had not taken place, and the order of discharge shall so provide.*"

154.   Defendants utilize past criminal convictions when determining plaintiffs level

of dangerousness, for the purpose of continuing plaintiffs indefinite detention

through civil commitment, prior to plaintiffs discharge of his criminal conviction(s).

Plaintiffs Branson, Nelson and Fageroos and other members of the subclass have

each been provided a letter from the Minn. Dept. of Corr. citing Minn. Stat. 609.165

subd. 1. Plaintiffs argue that Defendants therefore can no longer utilize those past

criminal convictions as the state of Minnesota has acknowledge (statutorily) "*such*

*conviction had not taken place*" after discharge of plaintiffs criminal sentences;

without medical justifications.

155.   Defendants have not provided plaintiffs with appropriate procedural

safeguards necessary to extend their indefinite confinement absent psychiatric

needs.

**DHS discriminate between "persons requiring treatment" and "Sexually Dangerous Persons."**

156.   Although persons subject to DHS commitment as Sexually Dangerous Persons

(SDP) and persons subject to civil commitment as "persons requiring treatment"

(PRT) are similarly situated—both groups are confined by DHS pursuant to civil commitment statutes—DHS discriminates against plaintiffs solely based on their status as SDPs. That unconstitutional discrimination includes, but is not limited to-

157.   An SDP may be detained if a state court finds cause to believe that he is a SDP. In contrast, a PRT may be detained only if a state court finds probable cause to believe that he is a PRT and there exists a serious risk of harm to the individual, other persons, or property if he is allowed at liberty. *Compare* Minn. Stat. § 253.21 *with* Minn. Stat. § 246B.01-02.

158.   An SDP may be detained if a state court finds that he is "likely to engage in further acts of sexually predatory conduct," a very broadly defined category of actual or attempted sexual misconduct (which the SDP statute presumes "constitute[s] a danger to the physical or mental health or safety of others"). In contrast, a PRT may be detained only if the court finds that he poses a "serious risk of harm," which means a "substantial likelihood" of "inflicting serious bodily harm on another person or inflicting significant property damages, as manifested by acts or threats." *Compare* Minn. Stat. § 253.21 *with* Minn. Stat. § 246B.01-02.

159.   There is no requirement that an SDP be given notice of the filing of a petition seeking his commitment as an SDP; in contrast, there is an express requirement that a PRT and DOC case worker be given such notice. *Compare* Minn. Stat. § 253.21 *with* Minn. Stat. § 246B.01-02.

160.    There is no requirement that an SDP be given mental evaluation while detained and awaiting his preliminary hearing; in contrast, there is an express requirement from a medical professional.

161.    Only if an SDP has a known intellectual or vulnerable disability is the State required to provide notice to his attorney or guardian of his detention and petition for confinement; in contrast, for each admission, the State is required to provide notice to his attorney, his spouse or guardian, and such other relatives or persons as the court may determine. *Compare* Minn. Stat. § 253.21 *with* Minn. Stat. § 246B.01-02.

162.    Since a state court does not have a probable cause hearing that a person is an SDP, the state court must order him to MSOP for evaluation; in contrast, if a state court finds probable cause that a person is a PRT, then the state court must consider less restrictive alternatives to involuntary detention for evaluation or treatment and can only order him detained for 14 day at MSOP. *Compare* Minn. Stat. § 253.21 *with* Minn. Stat. § 246B.01-02.

163.    An SDP's final commitment hearing must be held within 60 days of his remand to MSOP for evaluation; in contrast, a PRT's final commitment hearing must be held within 14 days of his referral for evaluation. *Compare* Minn. Stat. § 253.21 *with* Minn. Stat. § 246B.01-02.

164.    An SDP is not entitled to the procedural protections afforded by the Minnesota Rules of Evidence or Minnesota Rules of Civil Procedures in any commitment proceedings; in contrast a PRT is entitled to the protection and discovery rights

afforded by Minnesota Rules of Evidence or Minnesota Rules of Civil Procedures. *Compare* Minn. Stat. § 253.21 *with* Minn. Stat. § 246B.01-02.

165.    An SDP is committed indefinitely to DHS for confinement; in contrast, a PRT may not be committed to DHS for confinement for more 90 days.  Further hearing and orders are required to commit a PRT for more than 90 days. *Compare* Minn. Stat. § 253.21 *with* Minn. Stat. § 246B.01-02.

166.    An SDP is confined at MSOP sites; in contrast, a PRT must be confined in the lease restrictive environment, including non-hospitalization alternatives. *Compare* Minn. Stat. § 253D.02 Subd. 13 *with* Minn. Stat. § 253.21.

167.    An SDP's rights as a MSOP patient may be limited at any time for an indefinite period by any MSOP staff person under the assertion of "legitimate safety precautions and to [conform those rights to] the terms of the applicable individualized habilitation or treatment plan"; in contrast, a PRTs rights as a patient may be limited by his treating physician or psychiatrist only and for a period of 14 days only. *Compare* Minn. Stat. § 253.21 *with* Minn. Stat. § 246B.01-02.  Plaintiffs are not entitled to the exercise of professional judgment in receiving minimal training.

168.    DHS may demand that an SDP pay for his confinement; in contrast, DHS may not demand that a PRT pay for his/her confinement. *Compare* Minn. Stat. § 253.21 *with* Minn. Stat. § 246B.01-02.

169.    This disparate treatment by DHS of similarly situated confined persons cannot stand such scrutiny.  DHS subjected each plaintiff and the class to the unlawful

discrimination describe in this complaint.  Defendants knew or should have known
that their discrimination violated clearly established constitutional proscriptions.

## C. DEFENDANTS' DISCRIMINATE AGAINST PLAINTIFFS AND VIOLATION OF THEIR FUNDAMENTAL CONSTITUTIONAL RIGHTS IS NOT TO SERVE A COMPELLING STATE INTEREST.

***Defendants lack any rational means of classifying plaintiffs as Sexually Dangerous Persons.***

170.    For the State to constitutionally confine a person as an SDP, it must
demonstrate that the person (1) suffers from a mental defect; (2) that the defect
substantially impairs the person's self-control; and (3) that the impairment makes
the person likely to engage in further acts of sexually predatory conduct.
Defendants lack, however, any rational basis for making any of those
constitutionally mandated determinations.

171.    First, there is no medically recognized basis for the SDP statute's broad
definition of mental defect: "Is manifested by a sexual disorder, a personality
disorder, or other mental disorder or dysfunction that makes that individual likely to
engage in further acts of sexually predatory conduct."  Minn. Stat. § 246B.01-02.
That definition creates two new and undefined categories of mental diagnoses,
"mental … dysfunction" and "personality disorder."  These conditions are labels
without content or basis.  The American Psychiatric Association declares that the
State's invention of new diagnoses to justify indefinite confinement of SDPs is an
"unacceptable misuse of psychiatry."  Other scholars are more plain-spoken,

describing SDP definitions as "unacceptably fuzzy," creating cover for "the use of extensive preventive detention dressed up in the mental health language."

172.   The Minn. Stat. § 246B.01-02 demonstrates the arbitrary effect and discriminatory purpose of these made up SDP conditions and defects.  If a Sexually Dangerous Person truly suffered from a medically recognized mental condition and that condition caused that individual to pose a genuine danger to others, the State has always had the authority to commit that individual under its pre-existing civil commitment procedure for "persons requiring treatment." [*See Minn. Stat. § 253.21.*] It is telling that the State needed to enact the SDP statute so that it could specifically confine sex offenders who were not covered by its existing civil commitment statute because they were not mentally ill, and they do not require psychiatric treatment.  Data supports this observation: Given the breadth of the SDP definition of mental defect, scholars estimate that anywhere between 50% to 75% of the United States prison population could meet the SDP definition for mental dysfunction or personality defect, undermining the constitutional requirement that civil commitments targets only that small subgroup of mentally defective offenders who lack volitional control. *Kansas v. Crane*, 534 U.S. 407, 412-13 (2002).

173.   In fact, defendants have no rational basis for classifying plaintiffs as SDPs. Defendants cannot distinguish between a person who offends due to a volitional impairment because of a "mental dysfunction" or 'personality disorder" (SDP) and a person who offends as a matter of choice (common criminal).  The American Psychiatric Association observes that a person's volitional impairment cannot be

inferred from any diagnosis and, moreover, that repeated criminal misbehavior does not establish volitional impairment. Psychiatry – and the State – lack the capacity to distinguish between an irresistible impulse and an impulse not resisted. If an offender can resist the impulse but chooses not to, the offender is just a typical criminal. The State lacks any rational means of separating SDPs from common criminals who offends because they chose not to resist their criminal impulses.

174.   Second, the State lacks any rational means of predicting the future. To qualify as an SDP, defendants must demonstrate that a plaintiff is likely to commit a sex offense (predatory sexual conduct) in the future. To prove that assertion, defendants rely on state employees who opine a prediction about a plaintiff's future behavior. The most recent, peer-reviewed research shows, however, that opinions predicting future misconduct are junk science at best.

175.   Defendants employ two instruments to inform their predictions about a plaintiff's future behavior. The first is clinical assessment in which a state employee interviews a plaintiff, reviews his records, and then opines whether the plaintiff will offend in the future. Recent research shows that clinical assessments is no more effective than random chance in predicting future misconduct. The State acknowledges that clinical assessment is unreliable. *Risk Assessment and Community Notification Guidelines* (NDAGO 2005) ("There is little evidence that clinical judgment alone is useful in predicting future criminal or deviant behavior.")

176.   The second method used by defendants is actuarial assessment in which a state employee records certain personal traits of a plaintiff (the subject) and then

70

compares the subject's traits – age, offenses, marital status, and others – with those drawn from a group of known male only sex offenders (the sample).  By matching the subject's traits with the sample's traits, the state employee calculates a risk score.  The score reflects where the subject fits within a sample of known sex offenders within the sample who have the same actuarial score.  Over time, defendants have used a variety of actuarial instruments, most of which they now concede were useless in predicting the risk of further misconduct.

177.    Until 2013, for example, defendants relied exclusively on the MnSOST-R assessment.  In 2005, Attorney General Michael Hatch published guidelines for the classification of sex offenders based on their MNSOST-R scores.  The Minnesota State's Attorneys Association followed, publishing a manual for state's attorneys, relying exclusively on the MnSOST-R assessment.  Between 1999 and 2013, the DOC depended entirely on the MnSOST-R assessment in deciding which inmates to refer to state's attorneys for SDP commitment.  As recently as 2011, DOC's Parole and Probation Division directed its employees to use the MnSOST-R in preparing sentencing reports to state judges.  And, since the creation of the MSOP Sex Offender Treatment and Evaluation Program (SOTEP), MOSP has relied primarily on the MnSOST-R assessment (and the now discredited RRASOR assessment) to justify its predictions about a plaintiff's likelihood to offend in the future.

178.    Unfortunately, every recognized scholar and reputable corrections official now acknowledges that the MnSOST-R assessment is useless in predicting the likelihood

71

that an individual will offend in the future.  The most extensive, peer-reviewed study of the efficacy of MnSOST-R, published by the American Psychiatric Association (APA), concluded that the MnSOST-R "was no better than chance for predicting sexually violent recidivism."  *Field Validity of the Static-99 and MnSOST-R Among Sex Offenders Evaluated for Civil Commitment as Sexually Violent Predators* (Nov. 2009).  Long before 2009, scholars had warned defendants about MnSOST-R's lack of validity.  *See. e.g., The Uselessness of the Minnesota Sex Offender Screening Tool-Revised (MnSOST-R) in Commitment Decisions* (Univ. Minn. 2002).  Today, experts and scholars do not debate the validity of the MnSOST-R, the lodestar of Minnesota's SDP enterprise; they dismiss the MnSOST-R as junk science.

179.    Defendants have known for years that the MnSOST-R assessment was flawed.  That understanding was confirmed in an internal study, commissioned by DOC, on the effect and efficacy of the State' preventive detention policy.  Written by two University of North Dakota academics, the internal DOC study, entitled *MNSOST-R Score and Post-Release Recidivism Among Sex Offenders Released In North Dakota*, examined the effect of North Dakota's preventive detention policy:

> Following the November 2003 murder of Dru Sjodin by a released sex offender, policy changes occurred in both Minnesota and North Dakota in the interest of public safety.  In November of 2004, NDSP staffs were directed to send letters to county state's attorneys for all sex offenders nearing release who were scored 8 or higher on the MNSOST-R rather than 12 or higher as was previously utilized as a "presumptive" cut-point at which a letter would be sent absent any compelling reason not to send such a letter

…..

The present research examines whether individuals added to the group for whom letters requesting examination for civil commitment were sent (scoring 8-11 on the MnSOST-R) are in fact more likely than not to re-offend sexually.

…..

Prediction of "risk" of sexual re-offense has received a great deal of interest in recent years, as has social policy in regard to managing sex offenders and "protecting" the public. States and municipalities have enacted laws to restrict residency and movement of released offenders. While an unintended result of many of these activities may be to make it more difficult for released offenders to reintegrate into society, it may well be that some of these procedures intended to more closely monitor released offenders (especially higher risk offenders) may be a reason that those individuals scoring 8-11 on the MNSOST-R were significantly more likely NOT to re-offend than to re-offend. That is, though their (internal) risk may have been high, external controls may have reduced the risk of acting on their impulses to less than 50%.

…..

Since November 2004 and until very recently, Minnesota has used a MNSOST-R cut-score of 8 to trigger such letters. It appears this significantly increases the number of such letters, adds to the workloads of state's attorneys, and may lead to unjustified increases the population of the treatment facility in Jamestown. **All of this has occurred despite the lack of evidence in this study that such scores indicate these individuals are more likely than not to re-offend sexually.** Admittedly, samples in the present study were small, weakening analyses and the generality of the findings. However, "ecological" validity was maximal in that these were the real cases reviewed by the real reviewers and examined after various periods at liberty. Most importantly, the subjects were real offenders whose lives were impacted by these procedures.

…..

…..

If grouped scores are used to estimate "risk" for an individual, then there must be some rational reason to expect that the individual is represented by that group other than being within an array of scores that we have chosen for our own purposes. It is, in fact, individuals that appear in court to face civil commitment procedures, and the implications of "risk" estimates can include indefinite commitment to expensive confinement and treatment in a special sex offender

treatment unit. In North Dakota and Minnesota, until very recently, this has often amounted to an indefinite, at best, and, at, worst, a life sentence.

The UND-DOC study concluded:

> There is some risk, in my opinion, that when the inevitable and carefully thought out legal challenge to the commitment process arrives, procedures (such as presumptively sending letters for individuals unlikely to re-offend) which are not well founded in research may in fact endanger the standing of the entire civil commitment structure. Similarly, civil commitment is based not on punishment (and preventive detention is not legal in our country), but on disorders or conditions that require treatment. There is little doubt that there are individuals that should, in fact, be committed. It appears likely though that unsupported fears about sex offenders and poorly thought out policies and procedures may lead to casting too wide a net in the commitment process, thereby weakening it and making it more susceptible to challenge in the long term.

> Even after internal distribution of the UND-DOC study, DOC and DHS continued to rely on MnSOST-R scores as the basis for committing plaintiffs to indefinite confinement.

180.     Acknowledging these flaws, DOC and MSOP recently added a new actuarial assessment(s) known as the STATIC-99[5], to its assessment battery. But the APA study, *Field Validity of the Static-99 and MnSOST-R Among Sex Offenders Evaluated for Civil Commitment as Sexually Violent Predators*, determined that STATIC-99 is little better than the MnSOST-R. For example, where the STATIC-99 predicted a recidivism rate for those subjects rated as "high risk offenders" was only 6.3%. In fact, the APA study found that the only predictive power of STATIC-99 was its ability to perfectly predict which sex offenders the State picked for civil commitment.

---

[5] STATIC-99 has been revised several times. Each revision promises to correct the flaws crippling the accuracy of its predecessor. It is now commonly referred to as the STATIC-99R.

181.    Nonetheless, defendants continue to refer and confine plaintiffs based on actuarial scores, even though defendants know that those scores bear little or no reliable relationship to a plaintiff's likelihood of committing a new sex offense in the future.  Thus, for nearly two decades, the State has branded individuals as SDP's and condemned them to indefinite confinement – not based on any criminal conviction – but instead based on actuarial analyses long known to be no more accurate than a flip of a coin.

182.    Each of these actuarial instruments – MnSOST, MnSOST-R, RRASOR, STATIC-99, STATIC-99R – defends on a pernicious form of profiling.  STATIC-99 illustrates the point.  The sample on which the STATIC-99 is based consists of 1,208 male only sex offenders released from provincial prisons in Canada and jails in Great Britain between 1958 and 1974.  The power of any statistical sample depends on the extent to which it is representative of the subject under examination. Each of these actuarial instruments violates this most basic principle of inferential statistics.  Plainly, the propensity of Canadians or Englishmen to commit sex crimes more than fifty years ago predict little about the propensities of DICR inmates in 2015.  If that group of faceless men (the sample) behaved badly – whether by choice or mental defect – then defendants assume that a plaintiff (the subject) with the same actuarial score will behave badly too.  Moreover, the underlying data are suspect.  The STATIC-99, like each of these actuarial instruments, stitches together several different data sets, compiled by different recorders at difference times under different protocols.  Inter-rater unreliability, mismatched variables, and

75

unaccounted for but confounding variables sap the validity from each of defendants' actuarial instruments.

183.    Thus, based on an unpredictable variable—future conduct—caused by an unknowable variable—volitional impairment by mental defect—measured by an invalid instrument—actuarial assessment—and determined by an arbitrary cutoff (MnSOST = 12 in 2003; MnSOST = 8 since 2003), defendants subject plaintiffs to indefinite confinement, discriminating and stripping them of their fundamental constitutional rights. Such governmental conduct violates clearly established constitutional proscriptions.

***Even if defendants could defend their ability to classify plaintiff as Sexually Dangerous Persons, defendants cannot justify their discrimination and constitutional violations as necessary to serve a compelling state interest.***

184.    Defendants posit that their conduct advances the state interest in public safety. That belief is grounded in the weakly held misconception that sex offenders frequently recidivate. Today, that assertion is false. Thanks to longer prison sentences and post-prison monitoring. Adopted by the State at the same time it enacted the SDP statute, there is no necessary relationship between the practices challenged by plaintiffs and any compelling state interest, including public safety.

185.    Every recent, validated recidivism study finds that sex offenders—especially child molesters—rarely recidivate. The United States Department of Justice conducted a major study on the recidivism of sex offenders released from prison in 1994, tracking the behavior of thousands of former inmates for nearly a decade.

According to the U.S. Department of Justice, Office of Justice Programs, *Recidivism of Sex Offenders Released From Prison in 1994* (2003). The re-arrest rate for all released inmates committing new crimes is 5.3 %. Recidivism studies conducted in Washington, Indiana, Texas, and Massachusetts report similar findings.

186.    Recidivism studies also conclude that two factors—age and post-prison supervision—most closely correlated to reductions in recidivism. Sex offenders, like other violent criminals, age-out of their criminal behavior. Their likelihood to reoffend decreases over time, dropping drastically at certain ages. The imposition of longer prison terms for sex offenses results in much older offenders being released from prison. Even more important is post-prison supervision, the success of which is demonstrated by the low recidivism rate in Texas, where its SDP statute provides for commitment, but only in community placements.

187.    Even if defendants were able to show that recidivism by plaintiffs poses a genuine threat to a public safety, defendants cannot show that they lack less invasive means of advancing public safety. In fact, the State has already enacted those less discriminatory, less invasive means of advancing its compelling state interest.

188.    Since 1994, the State sentences and incarcerates sex offenders for longer prions terms than any other category of felons, except murders. Although the figures vary over time than the average prison sentence imposed on other felons imprisoned by DOCR.

77

189.    Since 1994, sex offenders who are not presently confined are highly
supervised and monitored by the State.  DOC's Parole and Probation Division
maintained around 50 field offices across Minnesota that monitor and supervise sex
offenders.  After completion of their prison sentences, sex offenders must register.
Under Minn. Stat. § 243, any person who commits an offense against a child or is
convicted of a sex crime must register in the county of his residence.  The State
advertises the identity of all sex offenders on a public website, listing their names,
home addresses, risk levels, and the dates, offenses, sentences, and courts of their
convictions.  The list is available at *www.sexoffender.nd.gov*, and runs for more
than 200 pages. The State also publicizes the identity of person deemed to be "high
risk offenders," publishing their photographs, SDP status, dates of birth, and home
addresses, with a built-in mapping function to locate sex offender's whereabouts.
That list currently includes more than 500 persons. The Office of Attorney General
also offers free service that provides email notification reporting if a sex offender
has relocated.

190.    Each of these public policies governing sex offenders—longer prison
sentences coupled with robust, post-prison supervision and monitoring-advances the
State's interest in public safety.  They are narrowly tailored to advance a compelling
state interest.  Their success demonstrates that indefinite confinement of SDPs is
not necessary; accordingly, defendants' treatment of plaintiffs cannot withstand
constitutional scrutiny.

78

***Defendants' remain deliberate indifferent to the Unconstitutional Structural Racism As-Applied To Minority Class Members***

191.    Each of the public policies in Minnesota governing the arbitrary evaluation of minority sex offenders—for civilly committed minorities face deep seated racial disparities in the forensic scientific tools used to civilly commit them.

192.    Shockingly, at least five of the actuarial tools used to civilly commit the minority sub class have never been peer tested prior to civil commitment.

193.    Mr. Goodwin, who is Ojibwe, challenges the Defendant's reliance on certain psychological and actuarial risk assessment tools on the ground that the validity of the tools when applied to Indigenous offenders has not been established through empirical research. The defendants either knew or should have known that the tools the defendants rely upon to keep Indigenous patients and other minorities confined is either outdated, junk science, or has serious racial disparities in its use.

194.    Mental health professionals in the United States have already produced evidence that  the use of five psychological and actuarial risk assessment tools, are susceptible to "**cross-cultural bias**" or "**variance**". Yet defendants fail to exercise professional judgment in the proper use of actuarial tools.

195.    One of these is the Hare Psychopathy Checklist Revised ("**PCL-R**"), a tool that was designed to assess the presence of psychopathy but is also used to assess the risk of recidivism. Mr. Goodwin also challenges the use of the Violence Risk Appraisal Guide ("**VRAG**") and the Sex offender Risk Appraisal Guide ("**SORAG**"), two actuarial tools designed to assess the risk of violent recidivism;

the **Static-99**, an actuarial tool designed to estimate the probability of sexual and

violent recidivism; and the Violence Risk Scale – Sex Offender ("**VRS-SO**"), a

rating scale designed to assess the risk of sexual recidivism that is used in

connection with the delivery of sex offender treatment.

196.    Indigenous and African American plaintiffs request the trial judge to declare

that, by continuing to rely on the impugned tools without confirming—even though

they knew or should have known—that they are invalid when applied to Indigenous

and Minority persons, that defendants had failed to "take all reasonable steps to

ensure that any information about an offender that it uses is as accurate…as

possible as required by the exercise of "professional judgment"".

197.    Defendants had, by relying on the impugned tools, infringed on the subclasses

rights under the Fourteenth Amendment as it applies to the due process clause and

their right to be at liberty. The subclass liberty interest had been adversely affected

by decisions related to security classification(s), level(s) of care, his suitability for

living in the community, and that under commitment was harmed by the impact of

him being labelled a "dangerous" "Mentally ill" "psychopath" when it was not true.

Plaintiffs state a claim that defendants conduct to arbitrarily label and stigmatize

them with junk science violates the Fourteenth Amendment and is a stigma-plus

violation that deprives them liberty.

198.    The defendants inability to cross culturalize its services to the minority class

demonstrates that indefinite confinement of SDPs is not necessary; accordingly,

defendants' treatment of plaintiffs cannot withstand constitutional scrutiny.

***Defendants' treatment of minors classified as Sexually Dangerous Persons further violates the Constitution.***

199.    Defendants refer, detain and confine minors as SDPs. Under SDP statute, a

person need not have been convicted or even charged with a sex offense as a

prerequisite for indefinite commitment.  As a result, minors—including plaintiffs

Daniel Larsen, Matthew Wong, and Jeremy Asher —were referred by the Juvenile

system and confined by DHS, even though they had never been charged as an adult

with a sex offense. The practice further violates due process and constitutes cruel

and unusual punishment.

200.    The County referred Daniel Larsen, Matthew Wong, and Jeremy Asher, for

commitment directly from a juvenile court; Daniel Larsen, Matthew Wong, and

Jeremy Asher, - lacked the maturity and experience to comprehend the magnitude

of their referral or commitment. None appreciated the significance of indefinite

confinement; none understood the nature, purpose of conditions of his confinement

at MSOP. As the Supreme Court has observed since enactment of the SDP statute,

juveniles, as compared to adults, have a "lack of maturity and an underdeveloped

sense of responsibility." *Graham v. Florida*, 560 U.S. 48, 68 (2010) (internal

quotations omitted).

201.    No defendant provided Daniel Larsen, Matthew Wong, and Jeremy Asher with

adequate and meaningful notice of the consequences of their acquiescence to

commitment as SDPs.  Each was misled and misinformed by his juvenile

counselor—a DOC employee or agent—that a stay at MSOP would be brief and

productive.  Since they lacked parents to guide them, each relied on the advice of his juvenile counselors, and caseworkers who themselves either lack an understanding of or misrepresented the duration and conditions of confinement as an SDP at MSOP.

202.    Compounding these due process violations, defendants admit that they lack any reliable means of predicting the future misconduct of a minor or the class. Between the ages of 17 and 27, humans undergo dramatic changes in brain function, especially in the development of executive function and impulse control. "[I]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects irreparable corruption."  560 U.S. at 68 (internal quotations omitted).  Defendants concede that there is no valid actuarial instrument to predict the rates at which a minor may commit sex offenses in the future, and MSOP's written evaluations of these plaintiffs acknowledge that it is difficult to predict future misconduct based on a juvenile's past misconduct.

203.    Moreover because experts and employee's in the field of civil commitment in the State of Minnesota are not Forensically trained, they continue to use outdated actuarial tools and actuarial tools that have not been peer tested on the minority population.  Class members have a liberty interest in the proper training of defendants employee's under the Due Process and Equal Protection clause.

204.    Committing these plaintiffs to indefinite confinement also constitutes cruel and unusual punishment. All twenty states with SDP statutes—except for Minnesota—mandate that an SDP must have been convicted of—or at least charged

with—a crime of sexual violence or predation as a prerequisite for civil commitment. In contrast, Minnesota does not require a charge or conviction. Instead, Minnesota commits crime-free persons who allegedly "have engaged in sexually predatory conduct," Minn. Stat. § 246B.01-02, loose concept covering, for example, an 18 year old boy obnoxiously "hitting on" a 17-year-old girl or a 17-year-old boy engaging in consensual sex with his 18-year-old camp counselor. The unprecedented reach of Minnesota's SDP statute—indefinite confinement of persons, including minors, who have never been charged as an adult with a sex offense—is not a drafting error; it was disclosed and emphasized to the Legislature in 1994—in submissions by Attorney General. The application of the SDP statute to persons who have never even charged with a sex offense, specially to minors, further violates the Constitution.

### Defendants' Inadequate Training and Supervision

205.    Next, Larsen and the class members seek to recover damages against the defendant's and the State Attorney General's Office for its failure to train its employee's adequately regarding the proper use of forensic evidence in civil commitment matters. Specifically, Larsen asserts that the State Attorney General's Office has no procedure in place to ensure that it's employees are familiar with the written policies and procedures pertaining to the use of forensic evidence that is evolving in commitment matters. He points to concerns and complaints from other

outside experts. Indicating that they were not trained in assessments in forensic settings when liberties are at stake.

206.    Larsen maintains that, regardless of expert assertions, the State Attorney General's Office fails to provide proper training to its employee's in assessing services to SOP clients during court proceedings, and thereby have acted with deliberate indifference in the training of its state officers.  They knew or should have known the need for proper training in clearly established rights.

## VI.    STATUTORY FRAMEWORK FOR EVALUATING DEFENDANTS CONDUCT

### A. THE AMERICAN WITH DISABILITIES ACT

207.    Although each plaintiff is – by definition under the SDP statute – a person with a disability, most SDPs are excluded from coverage under the American with Disabilities Act.  The ADA excludes "sexual behavioral disorders" from its definition of disability.  42 U.S.C. § 12211 exception to the ADA's definition of disability because they have disabilities other than alleged sexual behavioral disorders or do not have recognized sexual behavioral disorders.

208.    Title II of the ADA provides that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.  42 U.S.C. § 12132.  DHS and MSOP and their named executives violated this provision of the ADA as to each of the above captioned named plaintiffs among others were excluded or denied the benefits of

84

similarly situated, non-SDP patients requiring treatment. Each was also denied appropriate treatment in the least restrictive setting, as required by the ADA. None was considered for placement outside of a MSOP facility, as required for other non-SDP patients requiring treatment. Within the SDP program, none received any accommodation for their disabilities; none received psychiatric treatment for their individually diagnosed mental illnesses.

209.   Defendants have identified that each of the above captioned plaintiffs and those similarly situated suffers from mental or emotional impairments that substantially limit their major life activities, including their ability to work. For example, since at least 1984 Suddeth has had a record of a mental impairment that substantially limits his ability to work. Suddeth had received SSI for his disability on and off since 1984 during times he has lived outside an institutional setting. Individuals who meet the definition of disability for purposes of receiving SSI benefits also qualify as disabled under the federal disability status. *See Sinisgallo v. Town of Islip Hous. Auth.*, 865 F. Supp. 2d 307, 338 (E.D.N.Y. 2012).

210.   The ADA also includes patients who carry diagnosis of chemical dependency and other mental illness such as Bi-Polar, Severe Depression, PTSD and non-sexually related that would qualify as a disability.

211.   In Larsen's 2020 Annual SDP re-evaluation, the MSOP's examiner declined to provide a medical assessment to assess the medical necessity of his continuing mental health care and, the MSOP treatment facility further fails to assess the physical and mental condition of every patient as frequently as necessary. This

raises concerns that Larsen and other class members are not receiving proper care and treatment best adapted at rendering further supervision unnecessary.   Larsen has spent well over 43 years in punitive detention at MSOP where his classification as recidivist has "*aged out*" at the age of 59 but defendants fail to recognize that liberty interest.

212.    Larsen, and members of the ADA subclass, should be federally funded and treated in the least less restrictive environment, one where their disabilities may be properly treated.  Continued incarceration at MSOP facilities violates their rights under the ADA.

213.    In a claim pursuant to Title II of the Americans with Disabilities Act (ADA), specifically, 42 U.S.C. 12133, plaintiffs assert that they are a disabled person qualified for care and treatment, but that the defendants have decided to exclude them from an appropriate placement and have thereby discriminated against them. Finally, plaintiffs assert that they are disabled persons qualified for care and treatment, but that they have been denied access to the benefits and services provided by the defendants' federally-funded programs for the mentally disabled. Plaintiffs seek declaratory and injunctive relief, damages, costs, and such other relief as the court deems appropriate.

## B.  THE 1983 CLAIM FOR CONSPIRACY

### *Stigma-Plus Fourteenth Amendment Violation*

214.    Many officials have used fear and class members are arbitrarily labeled and
stigmatized for the purpose to win election votes for public office. While state
officials have sensationalized sex crimes in the media, they refuse to tell the truth
that class members are not sexually dangerous or mentally ill and should not be
civilly committed.

215.    There is evidence that Defendants Tim Walz, Jodi Harpstead, Nancy Johnston,
Marshall Smith, Keith Ellison, Dr. Elizabeth Peterson, Dr. Crystal Leal, Peter
Puffer, Kevin Moser, and Paul Schnell are acting in direct concert to deprive the
rights of plaintiffs labeled as civilly committed sex offenders.

216.    Moreover the evidence and legislative history point to the very elaborate
scheme that has allowed the defendants to engage in the status quo of preventive
detention merely because of plaintiffs arbitrary label and stigmas as a "civilly
committed sex offender".

217.    To prevail on a 1983 claim for conspiracy, the class members allege the
deprivation of a constitutional right or privilege. Here, as discussed above,
plaintiff's allegations explicitly point out the defendants efforts to deprive class
members their right to liberty. Allegations of conspiracy has been pled with
sufficient specificity and factual support to suggest a "meeting of the minds."

218.    Defendants Tim Walz acted in direct concert to deprive plaintiffs of their
constitutional right to liberty when he conspired by signing an executive order that
allows Defendants Jodi Harpstead, Nancy Johnston, Marshall Smith, Keith Ellison,

87

Dr. Elizabeth Peterson, Dr. Crystal Leal, Peter Puffer, Kevin Moser, and Paul Schnell, to oppress and keep the status quo of preventive detention.

219.   Plaintiffs propose that the defendants throughout the years of political fervor did in fact in many occasions use federal funding for the use of "narrow and private interests" to advance their own political interests.

220.   Defendants kept the civil conspiracy of unlawful preventive detention for civilly committed sex offenders by the following and are not limited to

Defendants Tim Walz, Jodi Harpstead, Nancy Johnston, Marshall Smith, Keith Ellison, Dr. Elizabeth Peterson, Dr. Crystal Leal, Peter Puffer, Kevin Moser, and Paul Schnell have policy in place that allows MSOP to engage preventive detention by allowing MSOP to obtain modification to the programming to push the status quo of punishment and lifelong preventive detention in the MSOP program.

221.   Defendant Keith Ellison and the Commissioner of Human Services defendant Jodi Harpstead conspired with the State legislature senator Jim Abeler to legislate a new "narrowly tailored" law to oppress class members because of the *Fugelseth* ruling. Specifically, the defendants argued that the State judicial appeal panel erred by requiring the commissioner to prove that *Fugelseth* is "in need of *inpatient* treatment and supervision." Minn. Stat. 253D.31 (emphasis added).

222.   It is on information and belief that because the *Fugelseth* ruling would have released hundreds of class members labeled as "civilly committed sex offenders" that are NOT "in need of treatment and supervision", the defendants conspired with

88

State legislature, senator Jim Abeler to make the civil commitment law even more punitive stringent.

223.    As a result of Defendant Keith Ellison  and the Attorney Generals' Office conspiring with Defendants Tim Walz, Jodi Harpstead, Nancy Johnston, Marshall Smith, Dr. Elizabeth Peterson, Dr. Crystal Leal, Peter Puffer, Kevin Moser, and Paul Schnell contends that changing the release criteria because of the *Fugelseth* case has pierced the "civil veil" from the plain meaning of the phrase "inpatient treatment and supervision" with the intent to keep class members oppressed under unlawful preventive detention.

224.    Defendants Tim Walz, Jodi Harpstead, Nancy Johnston, Marshall Smith, Keith Ellison, Dr. Elizabeth Peterson, Dr. Crystal Leal, Peter Puffer, Kevin Moser, and Paul Schnell failure to train or supervise the offending actors and caused the State to deprive class members right to minimal training and their liberty.

225.    Defendant Tim Walz, continues to violate his oath office by failing to uphold his constitutional duty as Governor to protect the laws of Minnesota and scientific facts that class members are not dangerous.  Defendant Tim Walz,  continues to conspire with past Governors and officials by re-signing an Executive Order as a tactic to strengthen older weaker criminal sentences and keep the status quo to oppress and substantially burdened the rights of class members liberty.

## VII.   INJURIES

226.   Defendants injured plaintiffs and the class by violating their constitutional and statutory rights, depriving them of their fundamental freedoms and discriminating against them.  Although plaintiffs seek only prospective relief, defendants' unlawful conduct continues to injure or threaten injury to plaintiffs long after plaintiffs have been released from defendants' custody.  Accordingly, plaintiffs and the class are entitled to prospective monetary relief but only to the extent that any defendant is not entitled to absolute or qualified immunity.

227.   There now exists an actual controversy between the parties regarding the defendants' duties under the federal Constitution and federal and state statutes. Accordingly, plaintiffs and the class are entitled to declaratory relief under each of their federal and state law claims, 28 U.S.C. § 2201, and Rule 57 of the Federal Rules of Civil Procedure.

228.   Unless enjoined, the defendants will continue to engage in the unlawful acts and practices described in this complaint.  Plaintiffs and the class have no adequate remedy at law.  Plaintiffs and the class are now suffering and will continue to suffer irreparable injury as a result of each defendant's unlawful conduct unless relief is provided by this Court.  Accordingly, plaintiffs and the class are entitled to injunctive relief under their federal and state law claims, 28 U.S.C. § 2202, and Rule 65 of the Federal Rules of Civil Procedure.

## VIII.   IMMUNITY, MOOTNESS, AND PRECLUSION

229.   No defendant is entitled to immunity.

   a)  Under each of the federal claims alleged in this complaint, Congress has
       abrogated each defendant's immunity pursuant to Section 5 of the
       Fourteenth Amendment; or,

   b)  Each defendant waived its immunity by accepting federal funds
       appropriated pursuant to Congress's Spending Power; or,

   c)  Immunity is inapposite because plaintiffs and the class seek prospective
       relief only; or,

   d)  Each defendant violated clearly established constitutional proscriptions and
       the SDP statute does not shield defendants from liability since it authorized
       the official conduct that is patently violative of fundamental constitutional
       principles; or,

   e)  The sole supplemental state law claim sues Tim Walz, Jodi Harpstead,
       Nancy Johnston, Marshall Smith, Keith Ellison, Dr. Elizabeth Peterson,
       Peter Puffer, Kevin Moser, and Paul Schnell in their personal capacities
       only.

230.   Plaintiffs' claims are not moot under *Karsjens*.

   a)  Even if a plaintiff were released from confinement by defendants, his
       claims are not moot because, under the circumstances of this case, his
       claims are capable of repetition yet evading review; and,

91

**b)** Even if a plaintiff were released from confinement by defendants, each plaintiff faces the risk of re-commitment under the SDP statute, a circumstance that has previously occurred with respect to some plaintiffs;

**c)** Even if a plaintiff were released from confinement by defendants, each plaintiff suffers lasting and continuing injury as a result of defendants' violation of his constitutional and statutory rights; and,

**d)** Even if a plaintiff were released from confinement by defendants, his claims are not moot because MNDHS continues to demand payment for his time spent at MSOP and as a SDP and a substantial controversy exists as to whether such a demand for payment is lawful, authorizing issuance of declaratory relief pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure.

231.   Plaintiffs' Claims Are Not Precluded Under The *Karsjens* Court.

**a)** By this action, plaintiffs, individually or as a class, do not seek review of their individual state commitment orders or judgments Minn. Stat. § 253B and/or Minn. Stat. § 253D;

**b)** By this action, plaintiffs, individually or as a class, do not seek to enforce the specific state law provision of Minn. Stat. § 253B and/or Minn. Stat. § 253D;

**c)** By this action, plaintiffs, individually or as a class, seek prospective, declaratory and injunctive relief only under federal law for violation of their

federal constitutional and statutory rights.  These claims could not be fairly and fully litigated – if they were addressed at all – in their commitment hearings Minn. Stat. § 253B and/or Minn. Stat. § 253D;

**d)**  By this action, plaintiffs, individually or as a class, are persons who are detained, committed, or have been committed to the custody of DHS. Based on that status, their claims neither interfere nor impede any proceeding in the state courts pursuant to Minn. Stat. § 253B and/or Minn. Stat. § 253D; and,

**e)**  By this action, plaintiffs, individually or as a class, are persons who are detained, confined, or have been confined or caused to be detained or confined by defendants in violation of the Constitution and federal statutes. They seek prospective, declaratory and injunctive relief only under federal law for violation of their federal rights.  None of the finding determined by any state court in connection with any proceeding under Minn. Stat. § 246B.01-02 should be accorded any preclusive effect since none of those state court findings were made in connection with or in context of the specific federal claims to be litigated in this action.  The claims alleged in this action pose unique questions of proof and different elements than those questions and elements considered, litigated, or determined by any state court in any proceeding under Minn. Stat. § 246B.01-02.

**f)**  By this action, the constitutional right at issue here is the Fourteenth Amendment's "Due Process Clause." This Clause bars state and local

government officials from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV.

232.   Plaintiffs' claims under the federal *DeShaney* Doctrine are not barred, the Due process Clause exists to "protect the people from the State, not to ensure that the State protect[s] the people from each other" (or, in the case of suicide, to ensure that the State protects a person from themselves), including protection from the dangerous pandemic of the Corona Virus, Covid-19.

233.   Under "substantive due process," federal courts have enunciated two narrow "exceptions" to this general rule. The *Special Relationship*, which is at issue here, is called the "custody exception." This law provides that, when the government "takes a person into its custody and holds him there against his will," such as plaintiffs, and when the government imprisons or institutionalizes an individual, government officials must then "assume some responsibility for [that individual's] safety and general well-being." Shockingly defendants simply disregard the mental health and safety of each plaintiff and fail to place them in the proper level of care.

234.   Defendants also fail to protect plaintiffs from serious threats of danger, by forcing plaintiffs to be incarcerated in a cell with mental and emotional unstable roommates, including the potential of contracting the Corona virus "Covid-19", where several clients contracted the disease and died.

**CITY MUNICIPAL LIABILITY CLAIM**

235.   Plaintiff(s) allege that there will be evidence in the future through discovery to support the discrimination claim based on plaintiffs arbitrary label and stigma as "civilly committed sex offenders"? Currently there is evidence that suggests defendants are purposefully discriminating against Plaintiffs based on their false and arbitrary label as "dangerous" or "mentally ill", in violation of the 14th Amendment of the US constitution.

236.   The Fourteenth Amendment of the Equal Protection Clause guarantees that people who are similarly situated will be treated alike. However, as described more specifically down below this court will find that the county practices concerning civilly committed persons are being done for the improper purpose to support preventive detention in violation of plaintiffs Fourteenth Amendment Right of the Equal Protection Clause.

237.   Defendants selective enforcement of state laws is not limited to:

A.   county defendants failure to protect plaintiffs from the future harm of unnecessary detention.

B.   in regards to the proper forensic training that would support the plaintiffs proper level of care.

C.   Selective enforcement of state laws in civil commitment matters.

D.   Selective enforcement of state laws [i.e. repetitive billing as if plaintiffs reside in an institutional setting for the mentally ill.].

E.   Selective enforcement of state laws is actionable under the Equal Protection Clause of the Fourteenth Amendment.

95

**F.**     Selective enforcement of state laws, while the County was placed on *official notice* for its illegal practices of MSOP clients through the *Karsjens* litigation, defendant(s) continue to encourage its unlawful practices.

238.     Plaintiff states a claim that the County defendants have a policy of inadequately training its employees to identify mental illness and that as a matter of policy, the county defendants inadequately investigated plaintiff(s) mental illnesses and allowed the unnecessary preventive detention. The County defendant(s) remain *deliberate indifferent* to the unconstitutional services being provided at MSOP for non-mentally ill patients, in violation of *Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978), the "*policymaking official*" of the county defendant(s).

239.     Plaintiff(s) allege that the Defendants, have unconstitutionally injured them in violation of their state, and federal rights. Plaintiff(s) allege that several state officials named as captioned above, conspired, and that the purpose of the conspiracy was to confine "civilly committed sex offenders" indefinitely even when they knew or should have known that they no longer suffered a mental illness or was dangerous enough to require medical treatment.

240.     Plaintiffs charge that the defendants intended to deprive the rights of the same or similarly situated persons under an unlawful <u>concerted</u> action of trumped up mental disorder(s). Defendants, including specifically The State of Minnesota; Minnesota Department of Human Services; Minnesota Sex Offender Program; Minnesota Attorney General's Office; Minnesota Department of Corrections;

Minnesota County's Health and Human Services – (i.e. Anoka County Health and Human Services Director, Ramsey County Health and Human Services Director, Sherburne County Health and Human Services Director, St. Louis County Health and Human Services Director, Goodhue County Health and Human Services Director, Dakota County Health and Human Services Director, Washington County Health and Human Services Director et.al)Tim Walz, Governor – State of Minnesota; Jodi Harpstead, Commissioner – Minnesota Department of Human Services; Nancy Johnston, Executive Director Minnesota Sex Offender Program – Minnesota Department of Human Services; Marshall Smith, Department of Health Systems Chief Executive Officer – Direct Care and Treatment – Minnesota Department of Human Services; Keith Ellison, Attorney General – State of Minnesota; Dr. Elizabeth Peterson, Associate Clinical Director – Psychological Services Director, Minnesota Sex Offender Program; Dr. Crystal Leal, Psychological Services Unit 1-C, Minnesota Sex Offender Program; Peter Puffer, Clinical Director – Chief Executive Officer III – Minnesota Department of Human Services, Minnesota Sex Offender Program; Kevin Moser, Operations Director – Chief Executive Officer III – Minnesota Department of Human Services, Minnesota Sex Offender Program; Paul Schnell, Commissioner - Minnesota Department of Corrections; an unknown number of John Does and Jane Does, engaged in conduct that rises to the level violating the 14th Amendment of the United States Constitutions, Equal Protection and the Due Process Clauses.

## IX.   CLAIMS

### A. FIRST CLAIM
### [42 U.S.C. § 1983]

### MUNICIPAL LIABILITY CLAIM IN VIOLATION OF THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION

1.    Plaintiff incorporates by reference and alleges paragraphs **1 through 175** of this complaint.

2.    The actions of Defendants, including specifically The State of Minnesota; Minnesota Department of Human Services; Minnesota Sex Offender Program; Minnesota Attorney General's Office; Minnesota Department of Corrections; Minnesota County's Health and Human Services – (i.e. Anoka County Health and Human Services Director, Ramsey County Health and Human Services Director, Sherburne County Health and Human Services Director, St. Louis County Health and Human Services Director, Goodhue County Health and Human Services Director, Dakota County Health and Human Services Director, Washington County Health and Human Services Director et.al)Tim Walz, Governor – State of Minnesota; Jodi Harpstead, Commissioner – Minnesota Department of Human Services; Nancy Johnston, Executive Director Minnesota Sex Offender Program – Minnesota Department of Human Services; Marshall Smith, Department of Health Systems Chief Executive Officer – Direct Care and Treatment – Minnesota Department of Human Services; Keith Ellison, Attorney General – State of Minnesota; Dr. Elizabeth Peterson, Associate Clinical Director – Psychological

Services Director, Minnesota Sex Offender Program; Dr. Crystal Leal, Psychological Services Unit 1-C, Minnesota Sex Offender Program; Peter Puffer, Clinical Director – Chief Executive Officer III – Minnesota Department of Human Services, Minnesota Sex Offender Program; Kevin Moser, Operations Director – Chief Executive Officer III – Minnesota Department of Human Services, Minnesota Sex Offender Program; Paul Schnell, Commissioner - Minnesota Department of Corrections; an unknown number of John Does and Jane Doe's Municipal Capacity. The actions of defendants described in the complaint are a Municipal Liability claim; in violation of the **Fourth and Fourteenth Amendment.** Therefore, the defendants have been deliberate indifferent in their duty to train or supervise its employees. They argue that the distinctions as a "dangerous" or "civilly committed sex offender" are irrational and violate the Equal Protection Clause of the Fourteenth Amendment.

3.    Plaintiff requests the Court award compensatory damages against all Defendants in their individual capacities and official capacities.

## X. CLAIMS

### B. SECOND CLAIM
### [42 U.S.C. § 1983]

**[Plaintiffs, the Plaintiff Class and the Minor Subclass vs.** State of Minnesota; Minnesota Department of Human Services; Minnesota Sex Offender Program; Minnesota Attorney General's Office; Minnesota Department of Corrections; Minnesota County's Health and Human Services – (i.e. Anoka County Health and Human Services Director, Ramsey County Health and Human Services Director, Sherburne County Health and Human Services Director, St. Louis County Health and Human Services Director,

Goodhue County Health and Human Services Director, Dakota County Health and Human Services Director, Washington County Health and Human Services Director et.al)Tim Walz, Governor – State of Minnesota; Jodi Harpstead, Commissioner – Minnesota Department of Human Services; Nancy Johnston, Executive Director Minnesota Sex Offender Program – Minnesota Department of Human Services; Marshall Smith, Department of Health Systems Chief Executive Officer – Direct Care and Treatment – Minnesota Department of Human Services; Keith Ellison, Attorney General – State of Minnesota; Dr. Elizabeth Peterson, Associate Clinical Director – Psychological Services Director, Minnesota Sex Offender Program; Dr. Crystal Leal, Psychological Services Unit 1-C, Minnesota Sex Offender Program; Peter Puffer, Clinical Director – Chief Executive Officer III – Minnesota Department of Human Services, Minnesota Sex Offender Program; Kevin Moser, Operations Director – Chief Executive Officer III – Minnesota Department of Human Services, Minnesota Sex Offender Program; Paul Schnell, Commissioner - Minnesota Department of Corrections; an unknown number of John Does and Jane Does, each in their Official Capacities;]

1.    Plaintiffs allege and incorporate by reference each paragraph as previously alleged in this complaint:

2.     Defendants injured plaintiffs and the class by depriving them of rights and freedoms guaranteed and protected by the First, Fourth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution in violating of the Civil Rights Act of 1871, 42 U.S.C. § 1983.

3.    Defendants injured plaintiffs by creating a system of oppression and retaliation to deny them their constitutional rights to **freedom of speech, assembly, religion, and petition** in knowing and deliberate violation by defendants of the First Amendment of the United States Constitution;

4.    Defendants injured plaintiffs Daniel Larsen, Matthew Wong, and Jeremy Asher and the minor subclass by violating their rights and freedoms guaranteed and

protected by the Eighth and Fourteenth Amendments to the United States

Constitution in violation of the Civil Rights Act of 1871, 42 U.S.C. § 1983.

## C. THIRD CLAIM
### [42 U.S.C. § 1983]

1.       Plaintiffs allege and incorporate by reference each paragraph as previously

alleged in this complaint:

2.       Defendants injured the entire class by creating a system of oppression and

violating the plaintiffs constitutional right **to Access the State Court(s)** of

Minnesota, and petition for their freedom in violation of the First, and Fourteenth

Amendments to the United States Constitution in violating of the Civil Rights Act

of 1871, 42 U.S.C. § 1983.

3.                 Defendants injured the entire class and the minor subclass by

violating their rights and freedoms guaranteed and protected by the Eighth and

Fourteenth Amendments to the United States Constitution in violation of the Civil

Rights Act of 1871, 42 U.S.C. § 1983.

## C.   FOURTH CLAIM
### [42 U.S.C. § 1983]

1.       Plaintiffs allege and incorporate by reference each paragraph as previously
alleged in this complaint:

2.       Defendants committed a systemic violation of plaintiffs constitutional right to

be free from ***purposeful discrimination*** as "civilly committed sex offenders" or the

label as a "dangerous" person in violation of the **Equal Protection Clause**, and

Fourteenth Amendments of the United States Constitution.

3.       Defendants injured the entire class and the minor subclass by violating their rights and freedoms guaranteed and protected by the Eighth and Fourteenth Amendments to the United States Constitution in violation of the Civil Rights Act of 1871, 42 U.S.C. § 1983.

### D.   FIFTH CLAIM
### [42 U.S.C. § 1983]

1.       Plaintiffs allege and incorporate by reference each paragraph as previously alleged in this complaint:

2.       <u>Deprivation</u> of **Substantive Due Process** in Violation of the Fourteenth Amendment, Actionable through Sec. 1983, against defendants.

3.       Defendants injured the entire class and the minor subclass by violating their rights and freedoms guaranteed and protected by the Eighth and Fourteenth Amendments to the United States Constitution in violation of the Civil Rights Act of 1871, 42 U.S.C. § 1983.

### E.  SIXTH CLAIM
### [42 U.S.C. § 1983]

1.       Plaintiffs allege and incorporate by reference each paragraph as previously alleged in this complaint:

2.       <u>Deprivation</u> of Class Members Right to **Liberty** in Violation of the Fourteenth Amendment, Actionable through Sec. 1983, against defendants.

3.       Defendants injured the entire class and the minor subclass by violating their rights and freedoms guaranteed and protected by the Eighth and Fourteenth

Amendments to the United States Constitution in violation of the Civil Rights Act of 1871, 42 U.S.C. § 1983.

### F.   SEVENTH CLAIM
### [42 U.S.C. § 1983]

1.      Plaintiffs allege and incorporate by reference each paragraph as previously alleged in this complaint:

2.      Plaintiffs state a claim that under **Section 1983 Conspiracy** that defendants State of Minnesota; Minnesota Department of Human Services; Minnesota Sex Offender Program; Minnesota Attorney General's Office; Minnesota Department of Corrections; Minnesota County's Health and Human Services – (i.e. Anoka County Health and Human Services Director, Ramsey County Health and Human Services Director, Sherburne County Health and Human Services Director, St. Louis County Health and Human Services Director, Goodhue County Health and Human Services Director, Dakota County Health and Human Services Director, Washington County Health and Human Services Director et.al)Tim Walz, Governor – State of Minnesota; Jodi Harpstead, Commissioner – Minnesota Department of Human Services; Nancy Johnston, Executive Director Minnesota Sex Offender Program – Minnesota Department of Human Services; Marshall Smith, Department of Health Systems Chief Executive Officer – Direct Care and Treatment – Minnesota Department of Human Services; Keith Ellison, Attorney General – State of Minnesota; Dr. Elizabeth Peterson, Associate Clinical Director – Psychological Services Director, Minnesota Sex Offender Program; Dr. Crystal Leal,

Psychological Services Unit 1-C, Minnesota Sex Offender Program; Peter Puffer, Clinical Director – Chief Executive Officer III – Minnesota Department of Human Services, Minnesota Sex Offender Program; Kevin Moser, Operations Director – Chief Executive Officer III – Minnesota Department of Human Services, Minnesota Sex Offender Program; Paul Schnell, Commissioner - Minnesota Department of Corrections; an unknown number of John Does and Jane Does for the "meeting of the minds" to cause the unlawful **preventive detention** of class members, in the persistent denial of the right to Liberty in violation of the Fourteenth Amendment of the United States Constitution.

3.    Defendants injured the entire class and the minor subclass by violating their rights and freedoms guaranteed and protected by the Eighth and Fourteenth Amendments to the United States Constitution in violation of the Civil Rights Act of 1871, 42 U.S.C. § 1983.

## G.  EIGHTH CLAIM
### [42 U.S.C. § 1983]

1.    Plaintiffs allege and incorporate by reference each paragraph as previously alleged in this complaint:

2.    While plaintiff's state a cause of action under Title II of Americans with Disabilities Act of 1990 (ADA), 42 USCS 12131-12134, class members bring 42 USCS 1983 claims of **failure to train and failure to supervise under ADA.**

3.    Defendants injured the entire class and the minor subclass by violating their rights and freedoms guaranteed and protected by the Eighth and Fourteenth

Amendments to the United States Constitution in violation of the Civil Rights Act of 1871, 42 U.S.C. § 1983.

### H.  NINTH CLAIM
### [42 U.S.C. § 1983]

1.     Plaintiffs allege and incorporate by reference each paragraph as previously alleged in this complaint:

2.     Plaintiffs state a claim for the **Intentional Infliction of Emotional Distress** (pain and suffering) against All Defendants.

3.     Defendants injured the entire class and the minor subclass by violating their rights and freedoms guaranteed and protected by the Eighth and Fourteenth Amendments to the United States Constitution in violation of the Civil Rights Act of 1871, 42 U.S.C. § 1983.

### I.  TENTH CLAIM
### [42 U.S.C. § 1985(3)]

1.     Plaintiffs allege and incorporate by reference each paragraph as previously alleged in this complaint:

2.     Defendants injured plaintiffs and the class members who are alleging claims under 42 U.S.C. 1983 for violations of their Fourteenth Amendment rights to procedural and substantive due process and to equal protection, and their Fourth Amendment right against unreasonable seizure, under 42 U.S.C. 1985(3) for conspiracy, by conspiring with other persons to deprive plaintiffs and the class of due process and the equal protection of the laws, or of equal privileges and

immunities under the laws, in violation of the Civil Rights Act of 1871 **42 U.S.C. §**
**1985(3)**.

3.      Defendants injured the entire class and the minor subclass by violating their
rights and freedoms guaranteed and protected by the Eighth and Fourteenth
Amendments to the United States Constitution in violation of the Civil Rights Act
of 1871, 42 U.S.C. § 1983.

## J.   ELEVENTH CLAIM
### [42 U.S.C. § 1986]

1.      Plaintiffs allege and incorporate by reference each paragraph as previously
alleged in this complaint:

2.      Defendants injured plaintiffs and the class by failing, refusing or neglecting to
prevent the deprivation of their right to due process and equal protection of laws in
violation of the Civil Rights Act of 1871, 42 U.S.C. § 1986.

3.      Defendants injured the entire class and the minor subclass by violating their
rights and freedoms guaranteed and protected by the Eighth and Fourteenth
Amendments to the United States Constitution in violation of the Civil Rights Act
of 1871, 42 U.S.C. § 1983.

## K.   TWELFTH CLAIM
### [ADA, 42 U.S.C. § 12131, et seq. and Rehabilitation Act, 29 USCS 701 et seq]

1.      Plaintiffs allege and incorporate by reference each paragraph as previously
alleged in this complaint:

2.      Defendants injured plaintiffs and members of the ADA subclass by excluding

them from participating in or **denying them benefits of the services, programs, or**

**activities of a public entity, or by subjecting them to discrimination** by any such

entity and denying them treatment in the least restrictive setting in violation of the

Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.* and Rehabilitation Act,

29 USCS 701 et seq.

## L.   THIRTEENTH CLAIM
### [42 U.S.C. § 1983]

**[Plaintiffs, the Plaintiff Class and the Subclass vs.** State of Minnesota; Minnesota
Department of Human Services; Minnesota Sex Offender Program; Minnesota Attorney
General's Office; Minnesota Department of Corrections; Minnesota County's Health and
Human Services – (i.e. Anoka County Health and Human Services Director, Ramsey
County Health and Human Services Director, Sherburne County Health and Human
Services Director, St. Louis County Health and Human Services Director, Goodhue
County Health and Human Services Director, Dakota County Health and Human Services
Director, Washington County Health and Human Services Director et.al)Tim Walz,
Governor – State of Minnesota; Jodi Harpstead, Commissioner – Minnesota Department
of Human Services; Nancy Johnston, Executive Director Minnesota Sex Offender
Program – Minnesota Department of Human Services; Marshall Smith, Department of
Health Systems Chief Executive Officer – Direct Care and Treatment – Minnesota
Department of Human Services; Keith Ellison, Attorney General – State of Minnesota;
Dr. Elizabeth Peterson, Associate Clinical Director – Psychological Services Director,
Minnesota Sex Offender Program; Dr. Crystal Leal, Psychological Services Unit 1-C,
Minnesota Sex Offender Program; Peter Puffer, Clinical Director – Chief Executive
Officer III – Minnesota Department of Human Services, Minnesota Sex Offender
Program; Kevin Moser, Operations Director – Chief Executive Officer III – Minnesota
Department of Human Services, Minnesota Sex Offender Program; Paul Schnell,
Commissioner - Minnesota Department of Corrections; an unknown number of John
Does and Jane Does, **each in their Official Capacities]**

1.      Plaintiffs allege and incorporate by reference each paragraph as previously
        alleged in this complaint:

2.      Defendants injured plaintiffs and the class by using government label and
stigma as "dangerous" or "civilly committed sex offenders" and other arbitrary
labels to oppress the class in violation of the **Stigma-plus** Fourteenth Amendment
Doctrine, in violating of the Civil Rights Act of 1871, 42 U.S.C. § 1983.

3.      Defendants injured plaintiffs Daniel Larsen, Matthew Wong, and Jeremy
Asher and the minor subclass by violating their rights and freedoms guaranteed and
protected by the Eighth and Fourteenth Amendments to the United States
Constitution in violation of the Civil Rights Act of 1871, 42 U.S.C. § 1983.

## I.  RELIEF

Accordingly,  plaintiffs, on behalf of themselves and the class and each subclass, pray
for judgment that:

1.      Certifies the class and each subclass pursuant to Fed. R. Civ. P. 23(a) and
23(b);

2.      Declares that defendants act unlawfully in violation of the First, Fourth, Sixth,
Eighth, and Fourteenth Amendments pursuant to 42 U.S.C. §§ 1983, 1985(3) and
1986 and the ADA, and Fed. R. Civ. P. 57;

3.      Declares by "the clearest proof" that the Sexually Dangerous Persons statute
has negated its civil intent and is unconstitutional violating the Double Jeopardy and
Ex Post Facto Clauses of the Minnesota and United States Constitutions.

4.      Declares that Minn. Stat. §246B.01-02 is unconstitutional *on its face* because
the Act does not provide for corrective measures for an erroneous commitment or a
false positive diagnosis.

5.       Declares that Minn. Stat. §246B.01-02 is unconstitutional *on its face* because it does not require that the defendants initiate court proceedings for release of individuals who no longer meet SDP criteria.

6.       Declares that Minn. Stat. §246B.01-02 is unconstitutional *on its face* and shall provide that civil commitment trials are done under the Beyond and Reasonable Doubt standard.

7.       Declares that the defendants are liable for the failure to train and supervise its employee's to the forensic training in civil commitment matters.

8.       Enters a temporary, preliminary and permanent injunctions enjoying defendants, their officials, employees, co-conspirators, agents, attorneys, and all persons in active concert or participating with any one of them from enforcing policies, practices or procedures that violate the First, Fourth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution, pursuant to 42 U.S.C. §§ 1983, 1985(3), 1986, ADA, and the Fed. R. Civ. P. 65;

9.       Enters affirmative injunctive relief requiring defendants, their officials, employees, co-conspirators, agents, attorneys, and all persons in active concert or participating with any one of them to undertake affirmative policies, practices and procedures that redress their violation of the First, Fourth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution, pursuant to 42 U.S.C. §§ 1983, 1985(3), 1986, ADA, and the Fed. R. Civ. P. 65.

10.      That awards attorneys' fees, costs, and expenses to plaintiffs, the class and each subclass; and,

11.    That awards any other relief deemed just and appropriate, including

prospective monetary relief but only to the extent that any defendant is not entitled

to absolute or qualified immunity.

## **VERIFICATION**

I have read the foregoing complaint and hereby verify that the matters as alleged
herein are true, except as to matters alleged on information and belief, and as to those, I
believe them to be true. I certify under penalty of perjury that the foregoing is true and
correct.

Respectfully submitted,

Dated: February 18, 2021.

Daniel Larsen
1111 Hwy. 73
Moose Lake, MN 55767

Joseph Goodwin

Guy Greene

Terry L. Branson

August Kingbird

Mark Wallace

Austin Black Elk

Michael Perseke

Chester Grauberger

Darrin Dotson

Dezeray Roblero-Barrios

Ernesto Longoria

Danny Stone

Leslie Tallman

Allen Pyron

Donald Hill

Joshua Brundy

David McGuire

Shawn Fletcher

Cormell Williamson

Raymond Semler

Roland Brant

Joseph Delle

Matthew Wong

Robert Suddeth

Anthony Garnett

Paul Knutson

Julian Caprice

Robert Smith

David Hamilton

Jacquard Larkin

Shawn Jamison

Aaron Hayes

Anthony Greene

Kevin Nelson

Richard Fageroos

Max Ortega

Dan Wilson

Michael Rogers

Jose Gutierrez

Sean Brinkman

Jeremy Asher

Thomas Bolter

Noreen Builder

Brent Nielsen

Christopher Sime

Kevin Karsjens

**Remainder of this page intentionally left blank**